CORNELIA W. ADAIR et al., Appellants, *v.* MARTIN BRIMMER et al., as Executors, etc., Respondents.

Under a power of sale, contained in a will, the executors are not authorized to dispose of the testator's real estate for the purpose of forming a mining corporation, and to receive stock of the corporation in payment therefor.

The fact that the testator, in his lifetime, was willing to make such a disposition of the lands, does not enlarge the powers of the executors ; it is only material as bearing upon the question of their good faith in the transaction.

Where executors have made such a transfer, they are personally liable for the market value of the lands at the time they conveyed, with interest from that time.

The will of W. devised to his executors certain real estate, in trust, with power to sell and to invest the proceeds in other lands, in bonds and mortgages, or in such securities as they should deem safe and for the greatest benefit of the *cestuis que trust.* The executors transferred the lands, which were undeveloped coal lands, for the purpose of organizing a mining corporation to develop and work them, taking pay in the stock of the corporation. After the funds of the company were exhausted, its bonds, secured by mortgage on its lands, were issued to raise funds to build a railroad to the lands, which bonds the stockholders were requested to take *pro rata*, and a portion of which the executors took, crediting themselves as executors the amount paid therefor, as an investment for the estate. The amount of the bonds issued was more than the value of the company's lands. No dividend had been paid, and it did not appear that the property was yielding any profits or income out of which interest could be paid. *Held,* that the executors were not entitled to the credit ; that the bonds were not such a security as a prudent executor or trustee would voluntarily have accepted as an investment for trust funds, or as the rules of courts of equity would have sanctioned ; and that it was questionable whether, even· if the investment had been made in the exercise of the power, it could be sustained ; but that it was not so made, as the purchase of the bonds was a *quasi* compulsory advance, to protect the stock received in payment for the lands ; and as the transaction by which the lands were sold and the stock acquired, was unauthorized, and thereby the executors became personally accountable to the estate for the value of the lands, the stock was their individual property, the investment in the bonds was for their individual account, and not chargeable to the estate.

Also *held,* that to establish a ratification by the *cestui que trust*, in such a case, the ratification must not only be clearly proved, but it must be shown that it was made with full knowledge of all the material facts, and also that the *cestui que trust* was fully apprised of their effect and of his or her legal rights in the premises.

Statement of case.

The maxim "*ignorantia legis excusat neminem*" cannot be invoked by the trustee in such a case.

*It seems,* that the proper rate of interest to be charged exectors in such a case is six per cent, with annual rests.

A debt, owing by one of several executors to the testator, at the time of his decease, is an asset in the hands of the debtor executor, for which he is solely responsible; but it should appear as such asset in a joint account rendered by the executors; it cannot be credited as an uncollected asset.

Two of the executors who were indebted to the estate, with the consent of their co-executors, gave their individual bond, in satisfaction of a mortgage payable by the estate; the transaction was advantageous to the estate, and the bond was so given to obviate an objection that the executors, as such, had no power to give it. *Held,* that the fair inference was that the bond was given on behalf of the estate, and the executors were entitled to be credited with payments made on said bond.

Executors are not entitled to be credited in their accounts with interest paid to raise money for advances to beneficiaries in excess of their distributive shares.

Where an accounting by executors does not purport to be final, or to dispose of the whole estate, it is not essential that interest should be computed down to the surrogate's decree; when all the accounts presented are made up to a certain date it is sufficient; the state of the accounts on that date, when establised, will furnish the starting point for a further or final account.

The accounts credited, and the surrogate's decree allowed to the executors, all payments made to beneficiaries, without regard to their distributive shares; *held,* error; that the accounts should have been made up so as to show the net amount of assets in the hands of all the executors collectively, and the distributive share to which each distributee was entitled at the time of the accounting, and that the executors were only entitled to credit for payments to distributees, to the extent of the distributive share to which each was entitled; they could not claim credit for over payments and thereby diminish or postpone the amounts payable to other legatees.

Where excessive payments have been made by one of several executors, without the authority or consent of the others, out of moneys which have come to his hands severally, and which have never come under the control of the other executors, that one will be held solely responsible for so much of the fund as has thus come to his hands, and be credited only with such amounts as have been legally paid, or which, if himself a legatee, he was legally entitled to retain. But the excess in his hands cannot be substracted from the general account of all the executors, as a payment to a legatee; it must remain in the account as so much assets of the estate, and when the whole balance of the estate, not legally disposed of, is thus ascertained, the question in what proportion the several executors are liable for such balance must be determined.

Where excessive payments are made, or moneys drawn, by one executor, with the consent or acquiescence of the others, out of a fund which has been collected, and has come into the possession of such other executors,

or the joint possession and control of all, they all become liable, not only to make good to the other distributees, on the final distribution, any excess of advances so made, but at all intermediate stages to make good all payments which become due or payable, under the provisions of the will, to such distributees.

So, also, where an executor, by his negligence, suffers his co-executor to receive and waste the estate, when he has the means of preventing it by proper care, he is liable to the beneficiaries for the waste.

As to whether where an agent appointed by all the executors jointly, to manage the financial affairs of the estate, makes over-payments out of the funds held by him as such agent, all the executors are jointly liable, *quære.*

Where securities of the estate were intrusted to one of the executors for sale, on his promise to pay the proceeds into the general fund, which promise he failed to perform. *Held,* that permitting him so to act was not such negligence on the part of the other executors as would render them liable for such default.

(Argued April 10, 1878; decided November 12, 1878.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, affirming a decree of the surrogate of the county of Livingston, upon an accounting of the executors of James S. Wadsworth, deceased.

By the will of said deceased his sons, Charles F. and Craig W. Wadsworth, and Martin Brimmer, were appointed executors.

The material clause of the will is as follows :

"I give and devise unto my executors hereinbefore appointed, the one-half part of all the lands and real estate of which I shall die seized or possessed, situated out of the counties of Livingston and Monroe, in the State of New York, and I give and bequeath unto my said executors the one-half part of all my personal estate, after the payment of my debts and the legacies specifically given in and by this will, as trustees of my daughters, Cornelia, Nancy and Elizabeth ; to have and to hold the said real and personal estate as such trustees as aforesaid, to them and to their successors lawfully appointed, in trust as follows, that is to say : The one-third part thereof to be so held for the benefit and dur-

ing the life of each of my said daughters. The said executors, as trustees, to receive the rents, profits and income of said real and personal property, and to pay the same annually, in equal portions, to each of my said daughters, and the receipts of each of my said daughters, whether married or unmarried, shall be a sufficient voucher for the income of one-third of the property hereby devised and bequeathed to my executors for the benefit of my said daughters.

\*          \*          \*          \*          \*          \*          \*          \*

" Whenever either of my said daughters shall die, leaving issue her surviving, such issue shall take an estate in fee, in one-third part of the real estate hereby devised to my said executors in trust, and one-third part of the personal estate hereby bequeathed to my executors in trust shall descend to and vest in such issue ; and whenever either of my said daughters shall die leaving no issue her surviving, then and in that case one-third part of the real and personal estate hereby devised and bequeathed to my executors in trust, shall descend to and vest in my heirs-at-law in fee, in the same manner that the same would have descended and vested if this will had not been made, and the said daughter had died without issue before my decease.

" And I hereby authorize my said executors, as such trustees, and their successors, to lease, or sell and convey all or any part of the real estate above devised to them in trust for my said daughters, and to invest the proceeds in other lands, or buildings, or bonds and mortgages, or in such other securities as they shall deem safe and for the greatest benefit of my said daughters, provided that three of said trustees consent to such sales or investments. Such lands, buildings, bonds and mortgages, or other securities, when so acquired, to be held by said trustees and their successors upon the same trusts, and to descend and go and be disposed of in the same manner that the property so sold would have been held, descended, gone and been disposed of if the same had not been so sold and conveyed by said trustees.

" Whenever there shall be less than three executors and

trustees competent to act in the execution of this will, or the trusts hereby created, it shall be the duty of the survivor or survivors to apply to the proper court for the appointment of other trustees and executors, and no act shall be done that shall bind my estate, or the funds belonging to said trusts, until such executors and trustees shall be appointed.

" It is my will, and I order and direct that no partition shall be made among my children of any of the real estate herein devised until four years after my decease, nor shall there be any distribution of my personal estate until four years after my decease."

The other half of the real estate, and of the residuary personal estate specified in said clause, the testator devised and bequeathed to his three sons.

The facts pertinent to the questions discussed are sufficiently stated in the opinion.

*W. W. MacFarland*, for appellants. Executors are bound to state their accounts not as they in fact kept them but as required by law. (*Willcox* v. *Smith*, 26 Barb., 316, 346; *Litchfield* v. *White*, 3 Seld., 438.) The executors had no authority to invest the funds of the estate in the bonds of a foreign corporation secured by a mortgage on coal mining lands in another State. (*Ackerman* v. *Emott*, 4 Barb., 626; *King* v. *Talbot*, 40 N. Y., 76; 50 Barb., 453; Perry on Trusts, §§ 458–460; *Steele* v. *Babcock*, 1 Hill, 527.) The executors are liable for the $10,000 with which they charged themselves in cash, received from Charles F. Wadsworth, March, 1, 1871. (*Baskin* v. *Baskin*, 4 Lans., 90.) The debts due from Charles to his father's estate were assets in the hands of the executors. (2 R. S., 84, § 14; Perry on Trusts, § 424.) The executors were erroneously credited with exchange. (*Willcox* v. *Smith*, 26 Barb., 316; *Ackerman* v. *Emott*, 4 id., 626; *King* v. *Talbot*, 50 id., 453; 40 N. Y., 87.) The yearly accounts stated being joint accounts the executors are estopped from now seeking to sever their liability. (Perry on Trusts, §§ 417–424; *Hart* v. *Ten Eyck*,

2 J. Ch., 62; *Litchfield* v. *White*, 7 N. Y., 438; *Spencer* v. *Spencer*, 11 Paige, 299; *Clark* v. *Clark*, 8 id., 152; *Clough* v. *Bond*, 3 M. & C., 491; *Monell* v. *Monell*, 5 J. Ch., 283.)

*George F. Danforth*, for respondent Brimmer. The investment by the executors in the bonds of the New Boston Coal Mining Company was one they had authority to make. (*King* v. *Talbot*, 40 N. Y., 90, 97.) The debts due the estate from Charles F. Wadsworth, never having been collected, the executors were entitled to credit themselves with them as uncollected. (R. S., part 2, chap. 6, title 3, art. 1, § 13; *Soverhill* v. *Suydam*, 2 T. & C., 466; *Sandford* v. *Sandford*, 45 N. Y., 723, 728.) The executors were properly credited with payments on the special bond to C. A. Murray. (*Tompkins* v. *Seely*, 2 Barb., 212; *Cuyler* v. *Ensworth*, 6 Paige, 32; *Eddy* v. *Traver*, id., 521; *Schermerhorn* v. *Barhydt*, 9 id., 28, 42, 43, 47; *Buchar* v. *Summer*, 2 Barb. Ch., 165; *Matthews* v. *Aiken*, 1 N. Y., 595.) The executors were properly credited with the items called exchange. (2 R. S., 93, § 58; Williams on Exrs., 1678; Dayton on Surr., 540.) The executors commissions were properly computed and allowed. (*Meacham* v. *Sternes*, 9 Paige, 398; *Wagstaff* v. *Lowerre*, 23 Barb., 209; 2 R. S., 93, § 58; amended 1863, chap. 362, p. 608.) Exceptions to a decree to be effectual, must specify the part or parts of the decree which are erroneous. (*Bainbridge* v. *McCullough*, 1 Hun, 488.) The defendant Brimmer omitted no duty as an executor and having exercised reasonable care and diligence in the management of the estate was not liable for the derelictions of his co-executors. (*Burt* v. *Burt*, 41 N. Y., 47; Story's Eq., § 121, *a* and note; *Edmonds* v. *Crenshaw*, 14 Pet., 166; *Sutherland* v. *Brush*, 7 J. Ch., 17, 22; *Hargthorpe* v. *Milford*, Cro. Eliz., 318; *Harvey* v. *Blakeman*, 4 Ves., 596; *Monell* v. *Monell*, 5 J. Ch., 283; *Manahan* v. *Gibbons*, 19 J. R., 427; *Banks* v. *Wilkes*, 3 Sandf. Ch., 99.)

*W. F. Cogswell*, for respondent Charles F. Wadsworth.

The provisions of 1 Revised Statutes, 754, §§ 23–26 are only applicable to cases of intestacy. (*Thompson* v. *Carmichael*, 3 Sandf. Ch., 120.) The decree was erroneous in that it charged too high a rate of interest. (*King* v. *Talbot*, 40 N. Y., 76.)

RAPALLO, J. The first exception to the surrogate's decree, contained in the petition of appeal, relates to the amount charged to the executors as the value of the coal lands in Pennsylvania, designated as the Glendower tract. On the 10th of October, 1864, the executors conveyed the share of this tract of which the testator died seized, (being one undivided third of a tract of 1,508 acres) to Franklin H. Delano, and John M. Forbes, owners of the other two-thirds, for the expressed consideration of one hundred and sixty-six thousand, six hundred and sixty-seven dollars ($166,667), and by a receipt indorsed on the deed, the executors acknowledged the receipt of that sum, as the full consideration money for the conveyance. They were permitted to show however, on the accounting before the auditor, that the only consideration actually received by them for this conveyance, was 10,000 shares of the capital stock of a Pennsylvania corporation known as the New Boston Coal Mining Company. It appeared in evidence that the conveyance by the executors to Delano and Forbes, was made for the purpose of organizing the company. That its nominal capital was $2,000,000, and that the whole of the Glendower tract was conveyed to it, one-fourth or $500,000, of the capital stock, at par, being paid to the executors for the one-third of the tract owned by the testator. That expenditures were made on the lands by the company thus formed, out of moneys raised by sales of its stock, and that after this fund had been exhausted, further sums were raised on bonds issued by the company to the amount of $500,000, secured by mortgage on its lands, for the purpose of building a railroad to its coal fields, and other improvements. That the company never paid any dividends

on its stock, and although Mr. Charles F. Wadsworth, one of the executors complained that it was notoriously mismanaged, he stated that it was useless to attempt any change in the management, as it was solely under the control of Mr. Delano, who held a majority of the stock. Mr. Brimmer also states in his correspondence with Mrs. Rogers that the company was very badly managed, but that he and Charles could not control the management of it.

It thus appears that by the action of the executors in regard to these lands, they were placed entirely out of their hands, and beyond their control, heavily incumbered by mortgage, and expenditures from which no return has been derived, and it is fairly to be inferred from the evidence that they have been virtually lost to the estate.

The learned auditor held that, notwithstanding the power of sale contained in the will, the executors were not authorized to make the disposition which they did of these lands, by devoting them to the formation of a *quasi* partnership to carry on the mining business, and that the willingness of the testator in his lifetime to make a similar disposition of the lands, could not enlarge the powers of the executors; and the evidence of his views was material only to establish their good faith in the transaction. That no ratification of their dealings by the parties in interest had been shown, or could have been made, the principal of the shares of the contestants in the estate being limited after their death, to their children, and that consequently the executors must be held personally responsible for the value of the land at the time they conveyed it away. These views are sustained in the opinion of the learned auditor by cogent reasoning which it is not necessary to repeat, and his conclusions were adopted by the surrogate, and by the Supreme Court at General Term, and are not brought in question on this appeal. But in fixing the amount chargeable to the executors as the value of these lands, we think the conclusion of the auditor is based upon an evident misapprehension of the testimony. After referring to various elements of uncertainty in determ-

ining the value, he concludes that the most equitable mode of adjusting the valuation would be to adopt that of the testator, and he then proceeds to state that in May, 1864, the testator authorized Delano to sell his share for $75,000. This statement shows that the learned auditor has fallen into a grave error. The $75,000 referred to by the testator in his communication to Mr. Delano, was simply the proportion of purchase-money which he desired should be paid in cash. In addition to this sum payable in cash, the testator was by the proposed plan of organization, to receive 2,000 shares (being one-sixth) of the entire stock of the company to be formed, and to which the whole property was to be conveyed. The stock thus assignable to him was valued at seventy-five dollars per share or $150,000, so that if the valuation of the testator be adopted, the amount would be $225,000, instead of $75,000. The stock of which he was to receive one-sixth, represented not only the entire land, but $225,000 of working capital which was to paid into the company for the development of the property. By the proposed arrangement he would have parted with only one-half of his interest for the $75,000 cash, the other half being retained in the shape of one-sixth of the entire stock of the company, and the half thus retained being enhanced in value by the accession of $225,000 of working capital. From the correspondence between Mr. Delano and the testator, and the various plans discussed between them, it is apparent that they placed a very high estimate upon the value of the property, and that the various propositions which they held under consideration, purported to yield in cash and stock for the whole property amounts varying from $1,200,000 to $875,000. Mr. Delano in discussing one offer received, wrote to the testator that it would scarcely be an object to be connected with the scheme if it would yield only $800,000 for the entire property, and he proceeded to show that by leasing, it could be made to produce in three years, a rental of $100,000 per annum, the interest of $1,400,000. The testator in reviewing the different schemes

of organizing a company, insisted that no plan should be adopted by which the cash payment to the owners of the land should be reduced below $225,000, or $75,000 for his share. This is what the auditor has erroneously assumed to be the testator's valuation of his entire interest. In the disposition made by the executors, it will be observed, no cash payment was stipulated for, but the whole purchase-money was paid in stock.

If the testator's own valuation should be adopted as the guide, it is clear that a much larger, and more than double the sum fixed by the auditor should be charged to the executors.

Proceeding next to the testimony of the witnesses examined on the subject of value, we find no evidence which sustains the valuation adopted by the auditor. Three witnesses only, undertake to affix a specific market value to the lands. Two on the part of the contestants, and one on the part of the executors. Mr. Thomas testifies that he was in 1864 engaged in the business of buying and selling coal lands in the region, and had been so engaged for eight or ten years and was acquainted with the value and market demand for such lands in the county where the tract in question was situated, and was, and had for twenty years been acquainted with the particular tract in controversy, and with its value since 1864. That in 1864 he would have paid for that land from three to four hundred dollars per acre as a speculation for future sale, and that it was as valuable at the date of his examination (1873) as in 1864, if not more so. That there was a large demand after 1864 for undeveloped coal lands situate in that county, that many thousands of acres had been sold, and there certainly would have been no difficulty in effecting a sale of those lands at, as he believed, a higher price than that named by him. That he had personally examined the land, and that adjoining, and that the price of coal land increased rapidly from 1863 and 1864 up to 1870. This valuation would amount to $450,000 to $600,000, for the tract, or $150,000 to $200,000, for the testator's share.

The other witness on the part of the contestants, Mr. George C. Potts testified that he was the general superintendent of the New Boston Coal Company, which operated the tract in question, was largely engaged in mining coal in that county, was acquainted with the value of, and market demand for such lands in that region about that time, and was thoroughly acquainted with the tract in question, that in 1865 they would have been cheap at $350 per acre, and he believed them worth more at the time of his examination (1873). That there was a very great demand for undeveloped coal lands in that county in 1864, and for two years afterwards.

The only other witness who speaks upon the subject is Mr. Stephen Harris, who being asked by the counsel for the executors to state whether in 1864 and 1865 the lands had any and what market value answered that he did not consider himself a competent witness on that point as he had nothing to do with sales at that time. After this statement, the witness being pressed to put a price upon the land, said the best estimate he could make was from $100 to $150 per acre, but that he made it with the qualifications before stated, as to his want of experience.

This testimony can hardly be considered as admissible after the disclaimer of the witness, and certainly not as of any weight. Other witnesses were examined as to the condition of the property, its quality as compared with other coal lands, its remoteness from railroad facilities, its unproductive state, and the necessity of a large expenditure of money, to render it productive, and the witnesses on both sides concur in stating that mining coal is an extremely hazardous and uncertain business. But no witness except Harris undertakes to controvert the statements of Thomas and Potts, as to the market value of the land, such as it was, and the witnesses on the part of the executors do not deny that the land was saleable in 1864 and 1865, one of them testifying that almost anything that had or was said to have coal in it could have been sold at that time, such was the general excitement.

The finding of the auditor as to the value of the land at the time of the conveyance cannot be sustained, and was manifestly made under a misapprehension of the testimony as to the testator's estimate. We think therefore that this item should be remanded to the surrogate for readjustment. Further evidence may be given, and particulars gone into as to the terms upon which the property could have been sold, by which a more accurate conclusion can be arrived at, as to what could have been realized from the land by a proper sale, at or about the time it was conveyed to Messrs. Delano and Forbes. The executors should be charged with that sum with interest from the time of such conveyance at the rate of six per cent per annum.

While the contestants are entitled to have the executors charged with the full market value of the land or the amount which could have been realized by a proper sale thereof, yet there being no ground for charging bad faith, or any improper motive, upon the executors, in this transaction, but simply an erroneous view of their powers and duties, great caution should be exercised in ascertaining the sum for which they are chargeable, and care should be taken not to mulct them in a greater amount than the estate could have realized from a sale of the land, at or about the time it was conveyed to Delano and Forbes.

The second error assigned is the credit to the executors of $52,500, as an investment made in 1869 and 1870 in sixty-two bonds of the New Boston Coal Mining Company. These bonds were part of the before mentioned issue of $500,000, of mortgage bonds of that company, made for the purpose of raising funds, to construct a railroad to its coal fields, and other improvements. Their security was dependent upon the success of the enterprise, which was purely speculative. They were not such a security as a prudent executor or trustee would have voluntarily selected for the investment of trust founds, as the rules of courts of equity would have sanctioned.

These rules have been adopted in the light of experience,

and adherence to them is essential to save trust estates from waste, especially in these days of almost innumerable speculative corporate enterprises. It is true that it was said in *King* v. *Talbot* (40 N. Y., 90), per WOODRUFF, J., that it was not necessary to hold that under no circumstances could an investment in the bonds of a railroad or other corporation, secured by a mortgage upon real estate, be deemed suitable or proper. That if the real estate was ample to insure the payment of the bonds, they were not necessarily to be regarded as inferior to the bond of an individual secured by mortgage, but that it would be open of course to all the inquiries which prudence would suggest if the bond and mortgage were those of an individual. The nature, location, and sufficiency of the security, and the terms of the mortgage and its availability for the protection and ultimate realization of the fund, must of course enter into the consideration.

Applying these tests the investment in question will not bear scrutiny. The security though technically real estate was of the most speculative character, an undeveloped coal mine, requiring a large outlay to make it available, and. although it had at the time a market value, it was sought for by purchasers with the view of being used, and its value consisted in being available, to carry on the mining business, which the testimony shows was of the most hazardous and uncertain nature. Oil lands at one time commanded enormous prices, but although they were real estate, no one would pretend that they would constitute a suitable basis for an investment of trust funds as a real estate investment. Looking next at the amount of the security, we find that even the speculative value was not such as to warrant a loan of $500,000, on the security of the land. The auditor places its value at $225,000, but assuming it to have been more than double that amount or of the value named in the deed from the executors $500,000, or any other figure for which the executors would be willing to be held responsible in accounting for the value of the land, it

would still fall far short of a sum sufficient to warrant a loan of half a million.  It is said that the money loaned was intended to be expended in the improvement of the land by constructing a railroad, but that engagement of the corporation was not real estate security, upon which a trustee would have the right to rely, nor was there any certainty that the railroad when constructed would be of any value.  It cannot be pretended that a trustee would be justified in investing trust funds on the security of an unconstructed railroad. The terms of the mortgage and its availability for the protection and ultimate realization of the fund, are not disclosed by the evidence, and all the light we have on that subject is that the executors held only about one-eighth of the bonds, which ordinarily would not enable them to control in the matter of foreclosure.  It does not appear that the property was yielding any profits or income out of which the interest could be paid.  Regarding the investment as one voluntarily made by the executors, with the view merely of placing the trust fund at interest, it cannot be sustained without overthrowing all the rules which have been established in regard to the securities in which trustees may invest.

It is contended on the part of the executors that the terms of the will gave them a larger discretion in the matter of investments, than the law gives to trustees generally, because it authorizes the executors to invest the proceeds of sale of the lands devised in trust for the testator's daughters, in other lands or in bonds and mortgages, or in such other securities as they shall deem safe, and for the greatest benefit of his said three daughters, provided that three of the trustees consent to such investments.  It is very questionable whether even if the investment had been made in the exercise of this power, the executors could have been sustained in the selection of so speculative a security as the one in question, but it is quite clear that it was not so made, and that the pur-. chase of these bonds was not for purposes of investment, or because the executors in their discretion deemed it a safe mode of placing surplus funds at interest, but that it was a

*quasi* compulsory advance, to promote the mining business, and protect the stock which the executors had received in payment for the coal lands and which was of the nominal value at par of $500,000. So far from being a discretionary investment of funds in their hands, the case shows that the executors had to raise the money to pay for the bonds, by discounting their individual notes. That the stockholders were requested to take these bonds *pro rata*, in proportion to their stock, after the other funds of the company had been exhausted, and Mr. Brimmer writes to Mrs. Rogers in 1871, that this investment in bonds was necessary to save the interest of the estate in the company, and that he thinks them pretty safe. It is nowhere pretended that the transaction was a voluntary investment of funds under the discretionary power. If the executors had been empowered by the will to carry on the mining business, the purchase of these bonds might be justified as a necessary expenditure or advance for the promotion of that business, but not otherwise. But it having been held that they were not so empowered, and that they had no right to acquire the stock as they did, it would be extremely incongruous to hold that they were entitled to use the funds of the estate, and put them at hazard for the protection of the same stock. Furthermore the necessary consequence of holding that the transaction by which the land was disposed of, and the stock acquired, was unauthorized and illegal, and that the executors are accountable to the estate for the market value of the land, is that the stock which they received became their individual property, and they carried on the business for their individual account. Such being the case, advances made in that business, or for the enhancement of the value of their stock, cannot be charged to the estate. To hold otherwise would justify the use of the trust funds, and putting them at risk by the executors in their own business.

The testimony as to a ratification of these transactions is contradicted by the contestants, and the auditor has found against such ratification. We concur in his conclusion. To

establish a ratification by a *cestui que trust*, the fact must not only be clearly proved, but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances, and also in a case like the present that the *cestui que trust* was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter. Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The *cestui que trust* must therefore not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up in equity by a trustee against his *cestui que trust*, must be proved, and will not be assumed. The maxim "*ignorantia legis excusat neminem*," cannot be invoked in such a case. The *cestui que trust* must be shown to have been apprised of his legal rights. (*Cumberland Coal Co.* v. *Sherman*, 20 Md. R., 151; S. C., 30 Barb., 575; *Lammott* v. *Bowley*, 6 H. & J., 526.)

The evidence in this case does not come up to the required standard, even if uncontradicted, and moreover the contestants could not by any ratification bar the rights of the children entitled in remainder to the principal of their shares. The executors no doubt acted on the supposition that they were dealing with this coal property as the testator would have done had he lived, and with the view of obtaining more for the property than could have been realized from an actual sale, two of them being personally interested in them as devisees. But, as remarked by the auditor in his opinion, the testator did not transmit to the executors the power so to deal, nor could he transmit to them his personal influence over the other owners, or the personal skill and judgment which he might have used for his protection, had he himself embarked in the joint enterprise. If those of his sons, who were executors, were willing for the prospect of realizing a large sum by the speculation, to hazard their shares of the lands, and their capital in developing and operating the

mines, matters should have been so arranged that the shares of the land held in trust for the daughters, and their issue, should have been sold, and realized their fair saleable value, free from the risks and complications which have ensued. The credits mentioned in the second exception, with interest from the dates of the payments for bonds, should be charged back to the executors, and all sums charged to the executors for interest collected on the bonds should be stricken out of the account, and the interest account re-adjusted accordingly. Following however the case of *King* v. *Talbot* (*supra*), the interest charged the executors on these items should be at the rate of six per cent per annum with annual rests.

We have examined the third, fourth, fifth, and sixth exceptions, and find no sufficient reason for interfering with the decree of the surrogate in respect to the matters to which they refer. The seventh exception relates to the credits to the executors of the sums which were included in the inventory as debts owing to the testator at the time of his decease by Charles F. Wadsworth and Craig W. Wadsworth, two of the executors. These sums were, under the statute, assets in the hands of the debtor executors, and should not be credited back as uncollected debts, but should remain in the account. They are assets of the estate, and necessary ingredients in ascertaining the total amount of the estate, and the amount of each distributive share. The account is a joint one, and should exhibit the whole estate in the hands of all the executors, independently of the question of the personal liability of the executors, as between themselves, to the legatees. That matter must be separately disposed of. The auditor expressly determined that these debts should not be credited as uncollected assets, and no reason is shown for departing from this decision. This exception should be allowed.

The eighth exception relates to the allowance of payments made by the executors to Mr. Murray on the special bond for an annuity, given by Charles F. and Craig W. Wadsworth, in satisfaction of the mortgage of $37,000, held by Mr. Murray. This mortgage was payable by the estate, as

the property covered by it was devised in trust for the sons, free of incumbrances. If the sons had paid the mortgage, they would have been entitled to credit for the sum paid, and as they substituted their own individual obligations in place of the mortgage, they were for the same reason entitled to reimbursement of what they might thus pay. But it is now contended by the contestants that the sons being debtors to the estate, to an amount exceeding the sum assumed by them, their co-executors should have allowed them in reduction of their indebtedness, the amount they assumed for the estate, and left Mr. Murray to look to them personally for the payment of their own bond. That Mr. Murray had no right to demand payment from the estate, he having relinquished and canceled his lien upon the land, and the obligation of the testator, and accepted in place thereof the individual obligation of the two sons, and that he could only look to them, as individuals. That consequently the executors were not justified in making payments to Mr. Murray for which they were not legally liable, and losing the opportunity of saving a part at least of the amounts due from the two sons.

But upon looking into the evidence it appears that the change of the original bond and mortgage into an agreement or bond for an annuity, was made with the assent of all the executors. That it was advantageous to the estate, and that the bond was given by Charles F., and Craig W. Wadsworth as individuals, in order to obviate the objection that the executors as such had no power to give the bond. It may reasonably be inferred from the evidence, that the bond was given in behalf of the estate, and that it was not the intention of the parties that the estate should be relieved of responsibility to Mr. Murray for the amount due him, and that he should look only to the individual responsibility of the two sons. The obligation was treated as a continuing indebtedness of the estate, and under the peculiar circumstances of the case, we think the payments made thereon by the executors should be allowed.

The ninth exception is to the allowance of certain small items called exchange, amounting · in the aggregate, according to the schedule referred to in the appellants points, to the sum of $1,003.63.   The items are very numerous, consisting of small sums averaging under ten dollars each, some of which are explained .by testimony, and others not.   Some of these items may ˙have been improperly allowed, as, for instance, exchange on notes discounted to raise money to pay for the New Boston Coal Company's bonds, and other discounts obtained by the estate to raise money for the accommodation of Charles F. and Craig W.   Others may be allowable, as for instance exchange on drafts remitted to the executors in payment of debts due to the estate.   We do not deem it necessary to go into a detailed examination now of the evidence bearing upon these items.   The tenth and eleventh exceptions, which relate to interest paid by the estate on discounts and otherwise, depend upon the same questions.   Mr. Brodie testifies that the money borrowed was used in part in payments to members of the family, those to Charles amounting to most; part to Craig and the others, and Mr. Brimmer writes that he objected to the ready money of the estate being used in advances to Charles.   The amount involved in these exceptions is not large, compared with those involved in the others, but the contestants have a legal right to insist that their shares should not be diminished by payments of interest made to raise money for advances to their brothers, in excess of their distributive shares, especially where, in the case of Charles at least, a considerable amount of these advances will be lost to the estate by reason of his insolvency.

As the interest account will necessarily have to be readjsted, the accounts embraced in the ninth, tenth and eleventh exceptions should be referred back to the surrogate for re-examination and adjustment, and the expenditures for exchange and interest necessarily incurred for the benefit of the estate can then be ascertained.

The twelfth exception is, that the executors should be charged with all moneys borrowed and debts incurred by

them, which at the date of the account were unpaid, and for which the estate was liable. This exception does not point out any sum so borrowed and not charged, and for which the estate is liable, and we cannot be expected to wade through the accounts and evidence to ascertain whether such a fact exists. The notes discounted appear to have been the individual notes of the executors.

The thirteenth exception is that the executors have not charged themselves with a sufficient amount for interest. Of course the exceptions already allowed will increase the amount of interest chargeable to them. The further claim is made that interest should have been computed to the date of the decree, July 24, 1876, instead of December 31, 1871. All the accounts are made up to the last named date. The accounting does not purport to be a final one, nor to dispose of the whole estate. The interest cannot be brought down without also bringing all the accounts down to the date of the decree. The state of the accounts on the 31st December, 1871, when established, will furnish the starting point for a further account, or for a final one when the estate is in a condition for final settlement.

The fourteenth exception is to that portion of the summary of the account contained in the decree, which credits to the executors all the payments made to legatees, and the interest charged in their accounts, without regard to their distributive shares. This exception is we think well taken. The account should be made up so as to show in the first instance the net amount of assets in the hands of all the executors collectively, and the distributive share to which each legatee is entitled. In ascertaining this amount the executors are entitled to credit for payments to legatees, only to the extent of the distributive share to which each legatee was entitled at the time of the accounting. If the executors have overpaid any of the legatees, they must look to such legatee for reimbursement. They cannot claim credit for the amount so overpaid, and thereby diminish or postpone the amounts payable to other legatees. (*Willcox* v. *Smith*, 26 Barb., 340.)

The question which of the executors are individually respon-
sible for the balance thus appearing, must be separately
determined.   It cannot be summarily disposed of by credit-
ing in gross to all the executors the entire sum advanced and
charged to legatees, in excess of their shares and the interest
thereon.   When excessive payments have been made, by one
of several executors, out of moneys which have come to his
hands separately, and have never been under the control of
the other executors, he will be held solely responsible for so
much of the fund as has thus come to his hands, and be credited
only with such amounts as have been legally paid out, or if
he be himself the legatee who has been overpaid, with such
sum as he was legally entitled to retain for his distributive
share.   But the excess in his hands cannot be substracted
from the general account of all the executors, as a payment
to a legatee.   It must remain in the account as so much
assets of the estate.   When the whole balance of the estate
not legally disposed of is thus ascertained, the question in
what proportions the several executors are liable for such
balance must be determined, but the total balance must first
appear without regard to that question.

The fifteenth and sixteenth exceptions bring up the matter
of the individual or joint liability of the executors, and pre-
sent very serious questions.   By the account as settled
by the auditor, it appears that the balance of principal
received by the executors after deducting sums paid out
for debts, expenses, and investments, and other payments,
was $263,270.93, and the balance of income was $247,666.35,
which included interest charged to the several legatees who
had overdrawn.   The total sum for distribution was conse-
quently $510,937.28.   Charles F. Wadsworth was entitled
under the will to one-sixth of this amount, viz., $43,878.49
of principal, and $41,277.72 of income, making together
$85,156.21.   He was however indebted to the estate at the
testator's death in the sum of $64,710.92, and had since that
time drawn from the funds of the estate his whole share of
the income, and other sums amounting with interest to

$245,256.30, in addition, leaving him indebted to the estate on the 31st of December, 1871, in the sum of $309,967.22, over and above his share of income, or $266,088.73, over and above his share of principal and income. A like indebtedness to the estate appears on the part of Craig W. Wadsworth, another of the executors to the amount of $60,880.52, over and above his distributive share of principal and income up to the date of the accounting. In the form in which the account is settled by the decree, by crediting to the executors as uncollected the debts due from Charles F. and Craig W. Wadsworth at the testator's death, and by crediting back to the executors all the payments to those two sons, and the interest charged to them, the balance for which the executors are held jointly and severally liable, is reduced to $15,005, and Craig W. and Charles F. Wadsworth, are respectively held solely liable for the sums due from them. Charles F. Wadsworth having become insolvent and decreed a bankrupt, it becomes an important question in the case to examine the circumstances under which the advances to him were made, and to determine whether his co-executors are liable for them, or any part of them. Craig W. Wadsworth has departed this life, and it is not alleged that his estate is insolvent, and probably his interest in the property not distributed by the decree in this proceeding, will be sufficient to cover the amount due from him. The amounts mentioned in the decree will of course be changed by the modifications of the account produced by the allowance of some of the contestants exceptions, but the question of the liability of the executors can now be determined.

For so much of the indebtedness of Charles F. Wadsworth as existed at the death of the testator, he of course is solely responsible, it being assets in his hands over which the other executors never had any control. This indebtedness (about $65,000 of principal) is to be taken into account however as reducing or satisfying the amount which he was entitled to draw as his distributive share of the principal and income of the estate and which amounted on the 31st of

December, 1871, to about $85,000 on the basis of the account as settled. Interest being chargeable to him on his indebtedness, from the date of the death of the testator, it is self-evident that this indebtedness was at all times from the death of the testator until the 31st of December, 1871, more than sufficient, on the basis of these accounts, to satisfy any sums which he was entitled to draw as his distributive share. All drafts made by him therefore from the time of the testator's death were, on the basis of the account as settled, in excess of the share he was entitled to draw at the time. The modifications of the account will make this excess still greater. These overdrafts appear to have been authorized and allowed by the other executors up to a certain amount, in anticipation of the sum to which it was supposed that Charles F. Wadsworth would ultimately be entitled on a final division of the real and personal estate, and it was not until after that amount had been reached and passed, that Mr. Brimmer, the executor whose liability is now the principal question, interposed, and objected to further payments to him. At this time the advances made to Charles F. Wadsworth by the estate, together with the debt due by him to the testator, amounted to $180,000, and it was then supposed that his interest on the ultimate division would reach that sum, and that no loss would accrue to the estate by reason of the advances to him.

The first question naturally in order is, what responsibility the other executors incurred by the advances to Charles up to this stage of the account. Charles being one of the executors, had equal power with the others to collect in the assets of the estate, and it is clear that if this indebtedness had arisen from the mere retention by him of funds collected by him as executor, and which had never been in the custody or under the control of the other executors, and they had not assented to his use of those funds for his own purposes, they would not be liable therefor. But it is equally clear, that if the sums were advanced to Charles out of a fund which had been collected, and had come into the possession

of the other executors, or the joint possession and control of all the executors, and they were so advanced with the consent or acquiescence of the other executors, the advances were made at their peril. If made in anticipation of the share to which Charles would be entitled on a final division, the executors consenting to such advances became liable not only to make good to the other distributees any excess of advances to Charles beyond his ultimate share, on the final distribution, but at all intermediate stages to make good all payments which are due or payable to the other distributees under the provisions of the will. They stood on the footing of assets collected by them, and paid over to their co-executors. Executors have no right by advancing to one distributee before he is entitled, to postpone others when entitled to payment, and when such distributee is also an executor, the excess advanced to him must be deemed assets of the estate for which all are accountable. The three daughters of the testator, for instance, who were entitled each to one-sixth of the annual income, could not be deprived of this income as it accrued, by advancing the principal of the estate to Charles, nor should it be diminished by the advance of a part of such principal. If the advances were made by or with the consent of the other executors they are bound to account for the income as if the funds were still in their hands invested. And to all intents and purposes, and at all stages of the accounting, funds advanced to one executor in excess of the share to which he is then entitled as legatee, if made by or with the consent of the others, must be deemed assets remaining in the hands of all the executors, and they are jointly and severally accountable therefor as such, and they and not their *cestuis que trust* must look for reimbursement to the debtor executor, or to any share of the estate to which he may ultimately be entitled as legatee. If this share turns out to be sufficient, they can protect themselves. If insufficient the loss must be theirs, and not that of the beneficiaries under the will. Sums thus advanced cannot, nor can the interest thereon, be charged in the

accounting exclusively to the executor receiving them and deducted from the joint account, but must be included in the general balance for which the executors are jointly and severally liable.

It remains then to be examined, whether the advances made to Charles from time to time in excess of the share which he was at the time of such advances, or up to the time of the accounting, entitled in his own right, were made under such circumstances that the other executors are liable therefor. It appears from the evidence that after the death of the testator, the financial affairs of the estate were conducted by a common agent of the executors, Mr. Janes, at the office the testator had kept in his lifetime at Geneseo. The executors Charles F. and Craig W., gave their personal supervision to the affairs of the office, the other executor, Mr. Brimmer, being a non-resident of the State, and occasionally in Europe, but visiting the office several times a year and examining the accounts. The funds and securities of the estate were held, and payments made, exclusively by Mr. Janes. The securities were kept at the Genesee Valley National Bank, in a tin trunk in their vault subject to the order of Mr. Janes, who kept the key personally, without any interference by either of the executors. Mr. Janes testifies that on one occasion Mr. Brimmer looked over the list of securities, but none of the other executors had any access to them, and whatever they wanted they had to get from him, Mr. Janes. That the bank account was kept in the name of Mr. Janes as agent, and no bank account was kept for the estate except in his name. That he drew the checks, and no one else drew any without his written consent, which was given, on two or three occasions only, to Craig, and never to Charles. That Mr. Brimmer examined the books whenever he was at the office. That when Craig and Charles wanted money, he, Janes, advanced it. Mr. Janes testifies that on some occasions in 1866 and 1867 Mr. Brimmer instructed him to pay money to Charles, and in 1869 forbade his paying any more money to Charles, stating that he had got his share

fully then ; that prior to that time Mr. Brimmer had given no directions against Craig and Charles having money.

It appears that the overpayments to Craig and Charles were made in this manner by Janes out of the funds held by him as agent for all the executors. It would present a serious question whether this fact alone would not be sufficient to render all the executors jointly liable for the application of these funds. Whether the possession of Mr. Janes was not their possession, and any disposition of them made by him, their joint act. If the funds had been embezzled or misapplied by Mr. Janes, all the executors would have been liable for the loss, and if they permitted him to advance them all to one of the executors, and they were thus lost, there would be much force in the argument that the funds having come to the joint possession of the three executors, all were bound to see to their proper application, and were responsible for a misapplication by the common agent, even without their express consent. But it is not necessary to the present case to rest wholly upon that ground, for there is ample evidence of the acquiescence of all the executors in the advances made up to the point now referred to. As has been shown, the sum due from Charles at the death of the testator was assets in his hands more than sufficient to cover any sums distributable to him at any time up to the date of the accounting, and therefore all his drafts were overdrafts. Should this prove on a re-examination of the account not to be strictly accurate, it will not affect the principle, for that will apply to all drafts which were in fact in excess of the sum then due him, whatever the amount. We find in Mr. Brimmer's correspondence, an explanation of the mode in which Charles' debt due to the estate (which then [in 1871] amounted to $327,000) had accumulated, and this explanation admits that at least $100,000 of the advances were made with the express consent of Mr. Brimmer. He says that $50 000 was advanced him on a mortgage of his share of the childrens' estate, which he deemed secure enough, though he did not like that use of the ready money of the estate. That

another $50,000 was advanced about 1866. That Mr. Bur-
den had earnestly asked his (Mr. Brimmer's) consent to this
as the only means of saving Charles from failure at that
time. That he (Mr. Brimmer) refused, but finally yielded.
The result of these transactions was that in August, 1867,
Mr. Brimmer being in Geneseo, and about to leave for
Europe, found that the debt of Charles to the estate (includ-
ing the $64,000 due at the testator's death) had mounted up
to $180,000. Mr. Brimmer considered that about the value
of Charles' interest in the estate, and that up to that time it
was safe enough against loss, and he says that it was then clearly
understood between the executors that Charles could and
should draw no more money from the office. Mr. Brimmer
then went to Europe, and remained absent until the summer
of 1869.

It is said that the $50,000 mortgage was almost wholly
paid, out of sales of the mortgaged lands, but it does not
appear that any account was taken of the mortgage, as the
whole sums advanced to Charles were regarded as a lien on
his share. The alleged payments however do not appear to
have reduced Charles' indebtedness, as it kept steadily increas-
ing, and at the time of the last advance of $50,000, Mr.
Brimmer must have known the state of the account, and the
evidence shows that up to $180,000, he did not object to the
advances. Mr. Brimmer admits in his testimony that he
knew from time to time as the accounts were presented to
him, that Charles was drawing more than his share as com-
pared with that of the other children, and that he remon-
strated with him, but took no steps to prevent him. That
up to the time he, Mr. Brimmer, went to Europe he sup-
posed that Charles' debt was hardly equal to his share of the
whole estate, including the real estate, and that at that time
he, Mr. Brimmer, said to him, (Charles) that he had drawn
all that he ought to draw, and he should draw no more, and
he agreed to that, and Mr. Brimmer rested on his good faith
and agreement not to do so, and relied for equalizing his
account with the other children upon his interest in the real

as well as the personal estate. At the time here referred to, as has been before stated, Charles' debt amounted to $180,000. It is not necessary for the purpose of establishing Mr. Brimmer's liability for these advances, to show his express consent to them. Where an executor by his negligence suffers his co-executor to receive and waste the estate, when he has the means of preventing it by proper care, he is liable to the beneficiaries under the will for the estate thus wasted. (*Clark* v. *Clark*, 8 Paige, 153.)

Upon all the evidence the auditor held that the co-executors of Mr. C. F. Wadsworth were ultimately responsible to the other beneficiaries under the will to make good these advances up to $180,000, if the interest of the debtor was insufficient for that purpose. This opinion was not however carried out in the surrogate's decree, for in that decree all the advances to Charles F., are credited to the executors and charged to him exclusively, and no liability, contingent or otherwise, for any part of them is imposed upon his co-executors. We concur in the opinion of the learned auditor that the co-executors are ultimately liable for this amount, but we do not think it goes quite far enough. We think they are immediately liable to account for all sums paid over by them, or by their authority to their co-executor, in excess of the amount then due him in his own right. Such excessive amounts remain assets of the estate, and cannot be applied in anticipation of sums which may thereafter become due him as legatee, and certainly not in anticipation of the value of his portion of the real estate on a future partition thereof. The executors appear to have acted on this principle up to the time of the accounting, for they have annually credited to the other legatees their shares of the interest accruing on the sums advanced to Charles and Craig. But on the accounting they sought to recall these credits.

For the indebtedness of Charles existing at the time of the departure of Mr. Brimmer for Europe in August, 1867, or so much of it as is in excess of the amount payable to Charles at the time of the accounting less the portion of

indebtedness which existed at the death of the testator, Mr. Brimmer should be held responsible with the other executors, and the amount due by Charles at the testator's death, with the interest thereon, should be first applied to the extinguishment of his distributive share of the estate. There appears to be no dispute as to the concurrence of Craig W. in the advances to Charles.

As to the advances to Craig W. the same principles should be applied, but in all probability these will be, or have been reimbursed by his share of the estate. The subsequent indebtedness of Charles appears to have arisen principally from the appropriation by him to his own use of about $60,000, proceeds of certain stocks and bonds which were sold by him for the estate.

These securities were entrusted to him for sale, on his promise to pay the proceeds into the office, which he failed to perform. He received these proceeds in his capacity of executor and they never came into the possession or under the control of his co-executors. We concur in the opinion of the auditor that they are not liable for the default of Charles in respect to these securities, and that permitting him to act in effecting their sale, and trusting to his promise to pay the proceeds into the office, was not, under the circumstances proved, such negligence or improvidence as should render them liable for his default. For that portion of the assets Charles should be held solely responsible, but his share of the estate should be bound therefor. The remaining portion of the indebtedness of Charles appears to have arisen from the accumulation of interest, and perhaps from further sums obtained by Charles from the funds of the estate. In what manner they were obtained does not distinctly appear, but it is quite apparent that they were obtained without the consent or approval of Mr. Brimmer, and sufficient facts to charge him therewith do not appear. The interest on the sums advanced to Charles, and for which Mr. Brimmer is chargeable, must of course be included in the amount of his joint and several liability.

The other exceptions relate mainly to the form of the account except that as to commissions; with the allowance of these we have concluded under the circumstances not to interfere.

The judgment of the General Term, and the decree of the surrogate should be reversed, and the account remanded to the surrogate to be re-adjusted in conformity with the opinion. The amount chargeable to the executors for the value of the coal lands, should be ascertained by the surrogate on a rehearing, and such other proofs as either party may desire to introduce, and the amount as thus ascertained inserted in the account. The costs of this appeal should be paid out of the estate.

All concur.

Ordered accordingly.