In the Matter of the Judicial Settlement of the Accounts of NATHAN C. REED, as Trustee under the Will of MARY E. HARMON, Deceased, Appellant.

HARRIET E. STEVENS and Others, Respondents.

*Executor and trustee — when not entitled to commissions in each capacity — investing in mortgages on land in another State — interest charged against the trustee — overpayments of income, when not charged against the cestui que trust.*

A provision of a will authorizing the trustee of a trust fund created thereby to keep the fund "invested at interest in such manner and upon such security and at such rate of interest as to him, in his discretion, shall seem proper and suitable," does not authorize the trustee to transgress the general rules applicable to the duties of trustees in the investment of trust funds.

An investment of trust funds in a note secured by a mortgage upon real estate outside the State of New York will not be sustained as a proper form of investment of the trust fund, where the evidence tends to show that the security is of a speculative character, and that it was not taken by the trustee for the purpose "of collection" or in the presence of an emergency requiring him to do so.

Where the proceeds of property belonging to a trust fund have been improperly invested, the trustee may be properly charged with interest at six per cent on the proceeds thus received by him, with annual rests.

Where a person, appointed executor and trustee in a will, has never had a final accounting or a separation of the functions of executor from those of trustee, either by a decree of the Surrogate's Court or by any independent act of the trustee, but has continued to keep his account as an executor's account, and

has never been discharged as executor, he is not entitled as trustee to receive commissions upon the principal of the fund.

A trustee has no right, by overpayments of income to the beneficiary, to encroach upon the principal of the trust fund; and where he has done so without giving notice to the beneficiary, who, being his daughter and under age, has a claim upon him for her support, he being financially responsible, he will not, on his accounting, be allowed a credit of such overpayment as against the beneficiary, especially where she has rendered services in her father's household of a value exceeding the amount of the alleged overpayments.

APPEAL by Nathan C. Reed, as trustee under the will of Mary E. Harmon, deceased, from a decree of the Surrogate's Court of Cayuga county, bearing date the 21st day of October, 1898, and entered in said Surrogate's Court, settling his accounts.

Mary E. Harmon, the testatrix, died on the 20th day of November, 1886. She was a maiden lady and a sister of the wife of the appellant, and resided in his family at the time of her death, where she had resided since 1867. Her will was admitted to probate and the appellant qualified as executor and trustee and entered upon the discharge of his duties as such. By the terms of the will $2,000 was set aside to be invested by the trustee for R. B. Harmon, who was to receive the income thereon during his life, and the remainder was to go to his son upon the decease of the father, and the residue of the estate was to be divided between the two children of the trustee, Harriet E. Reed, who was the contestant and respondent, and Frank B. Reed, when the son, Frank B. Reed, reached the age of thirty years, and until the son reached that age the trustee was directed to apply the income to the support and maintenance and education of the said two children. The wife of the trustee died in 1884. The daughter, the respondent, resided with her father, the trustee, until her marriage, which occurred in November, 1891. She became of age in September, 1889. An estrangement arose between her and her father about the time of her marriage. In January, 1888, the trustee had a partial judicial settlement of his accounts. At that time there remained in his hands of the assets of the estate five Michigan Central railroad bonds of the par value of $5,000, bearing interest at the rate of seven per cent. A large portion of the proceeds of the sale was mingled by the executor with his individual funds and a large portion of them was used by him in a venture he had in real estate in the suburbs of Denver, Col.

When the judicial decree, entered January 13, 1888, was presented there was in the hands of the trustee a balance of $6,605.68. In that balance were the five bonds of the Michigan Central Railroad Company, bearing coupons, and interest at the rate of seven per cent, becoming due in 1902. They were apparently carried in the executor's account at that time at par, although they were worth quite a large premium.

On March 4, 1892, the trustee bought a note of the Montclair Land Company, a Colorado real estate corporation, for $5,000. That note was secured by a trust deed of about thirty vacant lots in the same suburb and of the same character as the lots purchased by him in December previous. The lots and the trust deed were bought of W. W. Porter, a Denver real estate speculator, through his agent, Barnes, who had formerly been in the real estate business in Auburn, having an office with the trustee for a while, and subsequently removing to Denver to act as agent for Porter. The investment in the Denver mortgage took place without any examination by Reed of the real estate and with but a slight examination of the abstract of title. In addition to the $5,000 note the trustee invested some of the funds of the estate in two other western mortgages, one known as the Anderson bond and mortgage for $800, secured on land in Omaha, Neb., and on February 9, 1893, he bought what is known as the Lewis note and trust deed for $500, secured on land in Denver. Interest on the Anderson mortgage was defaulted in 1894, April 7th.

In June, 1897, Frank B. Reed became thirty years of age, and the capital of the residuary estate became due and payable. The trustee took no steps to obtain a settlement of his accounts, and Mrs. Stevens, his daughter, began this proceeding on the 16th day of December, 1897, requiring a citation to the executor to show cause why he should not settle his accounts. He filed an account and charged himself with $5,000 only as the value of the Michigan Central bonds. During the proceedings his attention was called to the circumstances of the sale of the bonds for a premium, and that he had made no entry of the premium in any account presented; and on application to the bank through which the bonds were sold, the amount of the premium was ascertained, and a supplemental account showing that he had received a premium, at the time of the sale of the bonds, of some $1,087.50 was filed.

The surrogate found that the proceeds of the Michigan Central railroad bonds were never deposited in the name of the estate or of the executor as such, and that he had omitted to credit the premium received in the accounts of the executor, or to make any entry in respect thereto until the filing of the supplemental account in this proceeding.

As conclusions of law the surrogate found :

" 1. The Porter, Anderson and Lewis mortgages were investments which the executor was not authorized by law to make ; and he is not entitled to credit for any losses sustained, or expenses paid or incurred on account of such investments.

" 2. The executor is chargeable with the entire proceeds of the sale of the Michigan Central bonds, with interest thereon from the date of the sale, as stated in the account hereto annexed, marked ' Schedule A.'

" 3. The executor is not entitled to credit for payment in excess of income received, made by him to or for the account of Harriet E. Stevens or Frank B. Reed prior to June 16th, 1897.

" 4. The executor is charged and credited, respectively, as stated in the account hereto annexed (Schedule 'A ')."

To those four conclusions of law a general exception was filed by the appellant in connection with sundry exceptions to findings of fact made by the surrogate.

*Frank S. Coburn*, for the appellant.

*Frederic E. Storke*, for the contestant, respondents.

HARDIN, P. J. :

Appellant's learned counsel seeks to justify the investments outside of the State of New York in lands in Denver in the State of Colorado, under the 4th clause found in the will of the testatrix. That clause is as follows : " To enable my executor to conveniently carry out this will, I hereby bequeath and devise to said executor all my real and personal property of which I shall die seized and owner, *but in trust*, however, for the purpose of this will, with power to sell and convey any and all my real estate, and until sold to rent, repair and alter same and to keep my personal property

invested at interest in such manner and upon such security and at such rate of interest as to him in his discretion shall seem proper and suitable."

We think the language used by the testatrix does not authorize the executor to transcend the rule in respect to trust investments.

In *Pocock* v. *Reddington* (5 Ves. 794) it appeared that the testator gave all the residue of his personal estate to trustees upon trust to convert his effects into ready money "and place the same out at interest at their discretion." In that case the trustees sold public funds which were left by the testator, instead of permitting the property to lie there, and it was said : " He had very imprudently, and I must say, very improperly, taken upon himself to lend the money of his wards to his own friends, and upon personal security ; and for that purpose he sold out stock, still charging himself with the dividends as before ; " and the master of the rolls said : " That is a transaction that it is impossible to permit to pass without animadversion and without reprobating it in the strongest manner. Admitting he did not mean that any loss should be incurred, but intended to replace it, as it is said, that is an argument which has been made use of in a very different case from this, and has cost those who trusted to it their lives. He had no right to put it in that hazard. No man is justified in putting the property of which he is trustee in jeopardy. Even if he had lent it to himself, giving real security, I should have looked with very jealous eyes upon it. Therefore, he must answer for that, with what he may be supposed reasonably to have made; and if he made more, he must answer for that too. *  *  * The rule upon this subject is, that when an executor or trustee, instead of executing the trust as he ought by laying out the property either in well-secured real estates or upon government securities, takes upon him to dispose of it in another manner, the *cestuys que trust* may call him to an account either way, having an option to make him replace it, or, if it is for their benefit, to affirm his conduct and take what he has sold it for."

In that case the trustee was charged with the proceeds of the sales made by him, and with interest thereon from the time the sales were received.

In *King* v. *Talbot* (40 N. Y. 76) the defendant and another were appointed executors, and in the will the following language was

used, "entrusting to their discretion the settlement of my affairs and the investment of my estate for the benefit of my heirs." The trustees made investments in canal and insurance stocks, and it was held that such investment was a violation of duty. It was further held that a trustee holding funds for investment "must invest in government or real estate securities. Any other investment would be a breach of duty and the trustee personally liable." In the course of the opinion of Woodruff, J., speaking of the language confiding a discretion to trustees, he says: "This last clause neither added to, nor in any wise affected the duty or responsibility of these executors; without it they were clothed with discretion; with it their discretion was to be exercised with all the care and prudence belonging to their trust relation to the beneficiaries. Such is the distinct doctrine of the cases very largely cited by the counsel for the parties, and is, I think, the necessary conclusion from the just rule of duty I have stated."

We think the language found in the will before us conferred upon the trustee a general discretion and no more. It did not authorize him to make any specific investments, and it did not authorize him to transcend the general rule applicable to the duties of trustees. (*Adair* v. *Brimmer*, 74 N. Y. 539; *Matter of James*, 146 id. 103.)

In *Adair* v. *Brimmer* (*supra*) power was given to invest the proceeds of the property sold in "other lands or buildings, or bonds and mortgages, or in such other securities as they shall deem safe and for the greatest benefit of my said daughters;" and it was held that the executors were not authorized to make a disposition of the proceeds contrary to the general rule relating to trustees.

We think the case of *Denike* v. *Harris* (84 N. Y. 89) does not aid the contention of the appellant. In that case there was a discretion in the executor to retain a specified investment, and the language of the will differs very essentially from that in the will before us.

It is claimed in behalf of the trustee that he informed his daughter of the investments and that she approved of the same. However, the testimony given by him in that respect is denied by her, and the trustee's evidence was apparently not credited by the surrogate.

In *Adair* v. *Brimmer* (*supra*) it was held that to establish a ratification by the *cestui que trust* "the ratification must not only be clearly proved, but it must be shown that it was made with full knowledge of all the material facts, and also that the *cestui que trust* was fully apprised of their effect and of his or her legal rights in the premises."

No such case as the rule requires was established by the appellant at the hearing in the Surrogate's Court.

(2) It is contended in behalf of the appellant that, regardless of the authority expressed in the will, the investments made by the appellant outside of the State should be upheld, and he calls our attention to *Ormiston* v. *Olcott* (84 N. Y. 339). In that case it was laid down as a general rule that investments by trustees " which take those funds beyond the jurisdiction of the court will not be sustained, and the trustee who so invests does so at the peril of being held responsible for the safety of the investments. This rule, however, is not so rigid as to admit of no possible exceptions, although the case must be very rare and the circumstances very unusual and peculiar to make it an exception."

In the course of the opinion delivered by FINCH, J., he said : " While, therefore, we are not disposed to say that an investment by a trustee in another State can never be consistent with the prudence and diligence required of him by the law, we still feel bound to say that such an investment, which takes the trust fund beyond our own jurisdiction, subjects it to other laws and the risk and inconvenience of distance and of foreign tribunals, will not be upheld by us as a general rule, and never unless in the presence of a clear and strong necessity or a very pressing emergency. The cases in our courts have quite clearly recognized the rule that an executor must invest in government or real estate securities."

That learned judge expressly states that the rule relates to voluntary investments made by the trustee. In that case the trustee was not held liable because the court determined that it was not a voluntary investment, but " of collection " and that the trustee " stood in the presence of an emergency which required him to do not so much what he preferred as what he could."

The rule laid down in the case from which we have just quoted was recognized in *Matter of Denton* v. *Sanford* (103 N. Y. 607),

where it was said that the facts disclosed were such as to bring the case within the exceptions to the rule. There was land belonging to the estate and the trustee sold it, and, not being able to obtain cash, took a first mortgage, which he supposed to be ample security to represent the trust. The court says: "They did not take available funds, and carry them out of the State, and there invest them in real estate; but they invested the trust funds in a mortgage which regularly and legitimately came to them upon land belonging to the estate which they sold, and we cannot say that it was a breach of duty on their part so to invest them."

The evidence tending to show the speculative condition of affairs in the suburbs of Denver at the time the trustee made his venture there is not such as should persuade us that the trustee was warranted in transgressing the rule, or that, in carrying the funds of the estate into that venture, he was acting in obedience to that strict rule which has been laid down to govern trustees in their dealings with trust funds.

Evidently he had become infatuated with a desire to make a speculative venture himself, and having borrowed some of the trust funds for the purpose of fostering his own venture, he subsequently determined to use other portions of the fund to acquire an interest in the property with which the parties with whom he had dealt were connected. His conduct in making the investment there is such that we cannot say that his venture falls within the exception laid down to the rule to which we have referred.

The Anderson mortgage was upon unimproved property and apparently was a loan made for some speculative purpose. The real estate was located in Omaha, Neb., and was not such an investment as a discreet trustee should have ventured to make.

(3) We think the executor was properly chargeable with the proceeds of the sale of the Michigan Central bonds and with interest thereon from the dates of the sales. The surrogate seems to have properly charged the trustee with interest on the funds received by him, with annual rests, and to have charged him with interest at six per cent. The rule adopted by the surrogate seems to be in accordance with the rule laid down in *King* v. *Talbot* (40 N. Y. 76) and in *Adair* v. *Brimmer* (74 id. 539) and in *Cook* v. *Lowry* (95 id. 103). In the latter case, at page 113, Andrews,

J., said : " We think there was no legal error in charging the defendant interest on the fund in his hands at the rate of seven per cent per annum, the legal rate of interest, with annual rests. The case presented by the evidence and by the findings exhibits gross dereliction of duty by the trustee. He kept no account of the trust fund, or of the income. He used the securities in his own business, changing them from time to time and realizing profits therefrom, of which he rendered no account. ＊　＊　＊　It is not usual to charge a trustee with the highest rate of interest where he has acted in good faith, without gross negligence, but each case must depend to a considerable degree on its own circumstances." (Citing *Raphael* v. *Boehm*, 11 Ves. 92; *Barney* v. *Saunders*, 16 How. [U. S.] 535 ; 2 Kent Com. 230, note, and cases cited.)

Upon the evidence in the Surrogate's Court we are of the opinion that he kept within the rule laid down by the Court of Appeals.

(4) Commissions on the income at five per cent were credited to the executor, in the account stated, by the surrogate.

The executor had never had a final accounting and a separation of the functions of the executor and the trustee, either by a decree of the Surrogate's Court or by any independent act of the trustee. He kept his account, what little there was of it, from the first as an executor's account, without any attempt to separate the funds or to set up any distinct trust for any legatee. He has never been discharged as executor.

In *Matter of Estate of Hood* (98 N. Y. 363) it was held that " even where by the terms of a will an executor may become a trustee simply, his liability as executor continues until there has been a final accounting, and a discharge by decree of the surrogate, or a direction in such decree that he hold the fund thereafter as trustee, and an entering by him upon the duties of trustee as distinct and separate from those of executor."

In *Matter of Accounting of Mason* (98 N. Y. 527) it appeared that the accounts of the executors, as such, " were fully and finally settled, and the trust funds were separated by the decree of the surrogate on such accounting," and it was there held " that thereafter the executors acted simply as trustees, and were entitled to com-

missions, as such, in addition to those received by them as executors."

We think the trustee was entitled to no further allowances than the surrogate has included in the accounts as stated.

We think the language used by Judge ANDREWS in *Cook* v. *Lowry* (95 N. Y. 114) is appropriate to the case in hand. He said : "The trust in this case was never executed. The trustee, in substance, converted the securities to his own use. He kept no proper account and rendered an account in many respects untrue, and subjected the *cestui que trust* to great difficulty and expense in attempting to unravel it. Commissions are allowed to trustees as a compensation for services in the execution of the trust, and in a case of gross neglect or of unfaithfulness, we think, the court may properly disallow them." (Citing 3 Redf. Wills, 554, and cases cited.)

Some minor questions are discussed in the brief of the appellant. We do not find any specific exceptions presenting error requiring us to interfere with the decision of the surrogate. (*Drake* v. *New York Iron Mine*, 156 N. Y. 91.)

We are inclined to the opinion that the surrogate was warranted in refusing to credit overpayments which were charged to Mrs. Stevens. The trustee had no right to encroach upon the principal, and he gave no notice that he was doing so to her until the account was filed ; and a portion of the charge which he attempts to make against his daughter apparently accrued during her infancy, when it was his duty, as a father, to support and maintain her, as he was a man of means, and, under the circumstances, he was not warranted in extending the amount which the will authorized him to expend on her account. (*Beardsley* v. *Hotchkiss*, 96 N. Y. 201.) She rendered substantial services in her father's household, and there is some evidence tending to show that they were worth, at least, the sum of two dollars and fifty cents per week in addition to her board.

The surrogate has rendered no affirmative judgment against the executor, although the value of the services exceed the amount of the alleged overpayments. The executor was allowed all payments that he made to his daughter after her marriage and departure from his house in November, 1891.

Upon all the facts disclosed in the record, we are of the opinion

that the surrogate dealt properly with the trustee in stating the accounts and adjudging his liabilities, and that the decree of the surrogate should be sustained.

All concurred.

Decree of the Surrogate's Court affirmed, with costs against the appellant personally, and proceedings remitted to the Surrogate's Court, with power to modify, as stated in the stipulation of Frank B. Reed, filed in this court on the argument. (See mem. filed with the clerk.)