Judgment affirmed, with costs, on plaintiff's stipulating to deduct $60 from recovery.

---

ST. JOHN CROFT, AS EXECUTOR, &c., OF MARY E. WILLIAMS, DECEASED, APPELLANT, v. EMMA E. WILLIAMS AND CORA E. WILLIAMS, RESPONDENTS.

*Liability of one executor for money received by his co-executor—when he will be charged with money receipted for, but not received by him—when for money he has allowed an insolvent co-executor to receive.*

Money lent by one executor to a co-executor, in reliance upon a statement of the latter that he intends to apply it to pay debts of the estate, is not a charge against the estate, and cannot be allowed to the executor so advancing the same on the passage of his accounts, unless it be shown by him that it was in fact, actually, so applied.

Two executors, having, in pursuance of a power of sale contained in a will, executed a contract for the sale of certain real estate, the purchaser made a payment thereon, by laying the money upon a table in the presence of both of the executors, one of whom picked up the money and put it in his pocket, and the other of whom signed a receipt, in his name alone, which was indorsed upon the back of the contract. The executor who took up the money was insolvent and known to his co-executor to be so.

*Held*, that the executor so signing the receipt was liable for the amount so received by his co-executor.

Although, when all of the executors join in the execution of a power of sale

conferred by a will, each is, as a general rule, only liable for the application of so much of the money received therefrom as actually comes into his possession or under his control, yet where one executor, knowing that his co-executor is in embarrassed circumstances and insolvent, allows the avails of such a sale to go into his hands, he is guilty of such negligence and want of care as to render him liable for the amount so received.

What evidence that money came into the possession of an executor is sufficient to charge him therewith, considered.

APPEAL by the above-named executor from a decree made by the surrogate of Ulster county, February 2, 1880, upon the final settlement of his accounts, by which he was decreed to pay to each of the respondents the sum of $1,986.20.

Mary Williams, the testatrix, died in the month of April, 1868, and resided then at Rondout with her husband, John Williams. She left four children—the respondents and two sons, all minors—residing with her and her husband at the time of her death. She made her will, giving two-thirds of her property to the respondents, to be equally divided between them, and one-third to her two sons, to be equally divided between them, and appointing her husband and Mr. Croft executors of her will, both of whom qualified as such. Mr. Croft, at the time of making such will and for many years before, resided and was engaged in business at Peekskill, and has ever since continued to do so; and Mr. Williams continued to reside at Rondout, and with him the respondents, until his death, which occurred in September, 1874. The testatrix left no personal property; but left a house and lot at Rondout in which she resided at the time of her death, and in which her husband continued to reside with his children until his death; also, a farm in the town of White Plains, in Westchester county, which was not sold until an agreement for that purpose was entered into, November 23, 1869.

In October, 1869, Williams applied to Croft for $2,000 to pay off a mortgage on the house and lot at Rondout, and bills and funeral expenses, which amount was, on October 13, 1869, advanced by Croft to Williams, and a note was given by the latter therefor, to secure the payment of which an interest to the extent of $2,000 in a bond and mortgage of $5,000, held in trust by C. Frost for the executors of Mary E. Williams, was assigned

with the assent of said John Williams to Croft. This $2,000 and interest, not having been applied by Williams to the payment of debts of the estate, the surrogate refused to allow to Mr. Croft.

On November 23, 1869, a contract was entered into between the executors and John Theill, for the sale of the White Plains farm and stock, and farming utensils thereon, for $16,500, the deed for which was taken by Mr. Charles Deuterman, the assignee of Theill, in the spring of 1870. There was a mortgage on the property which reduced the purchase money to be paid to the executors to $9,512.45, and which sum was paid as follows: $1,650, being ten per cent. of purchase-money, before the deed was given, to wit, $50 November 23, $800 December 18, 1869, $800 January 17, 1870, $1,167.77 about April 19, 1870, in one check, and $6,694.68 at the same time, the time of delivery of the deed, by another check signed by Deuterman.

*Calvin Frost*, for the appellant.

*J. Newton Fiero*, for the respondents.

LEARNED, P. J. :

The first question relates to the $2,000. The circumstances are as follows. The testatrix left no personal property of any consequence. She left a house and lot at Rondout, and a farm at White Plains, which the executors had a power to sell. She died in April, 1868. In October, 1869, Williams, one of the executors, applied to Croft, the other, for $2,000. The purpose avowed by Williams, was to pay a mortgage on the house and lot, and to pay bills and funeral expenses. Thereupon Croft advanced to Williams, at that time, $2,000 ; and took Williams's note therefor, not signed as executor. Williams, at the time, made up, but did not execute, a paper, reciting that he had paid out of his own funds this bond and mortgage, and a note and debts of the estate, amounting in all to $5,064.46 ; and containing an assignment of these claims to Croft, as collateral to the $2,000 note. For this $2,000 note thus given to Croft, Williams confessed judgment to Croft, January, 1873.

Croft now claims to be allowed for this $2,000 and interes

thereon. The surrogate disallowed this, and properly. It was on its face a loan to Williams personally. If Williams stated that he was about to pay debts of the estate, and Croft lent him money for that·purpose, we see no reason for charging the estate on account of Williams's intention, expressed but not performed. If an executor lends money to a co-executor, it is plain that this cannot be made a charge against the estate, simply because the executor who borrowed it stated, honestly or falsely, his intention to pay debts of the estate. If Croft had then had money of the estate, this loan of it to Williams would not have discharged Croft. (*Adair* v. *Brimmer*, 74 N. Y., 539.) Croft was bound to see that the money of the estate which came to him, was properly applied. So that, even if we treat this transaction as an advance to Williams in his capacity as executor, we do not see that Croft stands in any better position. Whatever debts Williams had, in fact, previously paid had been made good to him by money which came into his hands.

Second. The appellant objects that he is charged with $800 received December 18, 1869, on the sale of the farm. It is not disputed that he received this money. His defense is that he paid it to his co-executor, Williams. He produces a receipt from Williams, not as executor, dated two days afterwards, for the amount. For the reasons above given this does not discharge him. We do not think it necessary to discuss the point. If there may be, sometimes, peculiar circumstances under which such a payment to a co-executor would discharge an executor, none such exist in this case. The same may be said as to the item of $636.12, received by Croft, May 10, 1872.

Third. It is claimed by the respondent that Croft received, and should be charged with, $50 paid by John Theill November 23, 1869, and also with $800 paid by him, as of the date of January 17, 1870. The appellant insists, as a matter of fact that he did not receive these payments; and the surrogate so found. The respondent seeks to review these findings of fact. These sums of money were paid upon a contract, made by Croft and Williams, as executors, for the sale of the White Plains farm. The receipts for said payments are indorsed on the contract, and each is signed by Croft.

As to the $50, Theill, the purchaser, testifies that he paid it to Croft. Theill is interested, being the father of the testatrix. Croft at first testified that he must have received it, as his signature was there; but that he had no idea he had ever seen it; that is, the money. Afterwards he testified: "We all stood by the desk, and Mr. Theill laid down the $50, and Williams picked it up and put it in his pocket, and I receipted it." Mr. Laird testifies to substantially the same facts. Mr. Laird is a lawyer, and drew the receipt. He says that Theill came up and laid the money on the desk; that Williams took it up and put it in his pocket; and then that Croft signed the receipt.

The question of the liability of an executor, in such a case, cannot depend on such a merely formal matter as his actually touching, or handling the money. Suppose that Croft had picked up the money, had given a receipt for it, and then had handed it over to his co-executor, thus putting it in his co-executor's power to waste or misapply it. Under the doctrine above cited, Croft would not have been discharged from the liability imposed by his receiving the money. It can make no practical difference, both parties being together, that the money was not actually held, for a moment or two, in Croft's hands. The money was there, and within his power. By signing the receipt, he acknowledged that he was the executor to whose fidelity it was intrusted. He might have refused to sign the receipt, unless he should have the money. But by signing the receipt, and consenting to Williams's taking the money, he did substantially the same act as if a clerk of his had actually taken the money, and Croft had given the receipt.

Judge STORY well says that, if two executors sign a receipt, it is *prima facie* evidence that the money came to the hands of both; but either of them may show that his joining in the receipt was merely formal. (2 Story Eq., 1283.) But here the other executor did not sign; and Croft's signing could not have been formal merely. Without his signature there would have been no receipt.

We do not mean to controvert the doctrine that a receipt may be explained. The difficulty is that Croft does not explain this receipt. On the contrary, he shows that, if he did not take manual

possession of the money, it was because he voluntarily permitted some one else to take it away. (1 Perry on Trusts, 510.)

We think Croft was chargeable with the $50.

As to the $800 paid in January, 1870, Croft's receipt is shown. Theill says that he sent the money, and that he was notified by his messenger that Croft would not sign the receipt; that he went to see Croft the next day, and asked him if he received the money; that Croft equivocated; that he asked Croft if he would indorse it, and said: " If you do not, I have my remedy;" that Croft then wrote the receipt on the contract and signed it. Croft denies that he received the money, or that he saw any one receive it; says that he does not know who received it; that he objected to signing the receipt, because he had not had the money. To sustain Croft, it is testified by Laird that he drew up the receipt at the request of Williams. And it is testified, by one familiar with Laird's handwriting, that the body of the receipt is in his handwriting. These receipts, it is to be noticed, are on that agreement which was held by the purchaser. The duplicate, held by the executors, contains only one receipt, that of the first $50. And Theill reiterates the statement that Croft wrote and signed the receipt, and admitted that he had had the money.

There is thus a perplexing conflict of evidence. It is difficult to understand how Williams could have brought to Laird the *purchaser's* duplicate of the agreement. Theill was not present at that time. Williams did not sign the receipt.

If we leave out the evidence of Theill and of Laird, as contradictory as to who wrote the body of the receipt, and come to the examination of the evidence on the real point, viz., whether Croft had the $800, it stands thus : The next of kin produce Croft's receipt for the money, admitted to be genuine ; and there is no doubt that the money was paid to some one. Croft, on the other hand, denies that he received it, and does not show that it was received by any one else. Croft has never kept any account with the estate, and, even since the death of Williams, he has never kept the moneys of the estate separate. Thus the denial of the receipt of the money stands on his uncorroborated testimony, without anything like a voucher or a contemporaneous series of entries to sup-

port his denial. The case would be different, if he showed affirmatively that Williams received the money, or if his account as executor, kept at that time, showed that no such money was entered therein. But, as it is, there is nothing to contradict his receipt but his own testimony. We do not think that his own evidence is enough to discharge him as to this item.

Fourth. The next item which the respondents say should have been charged against Croft is that of $1,167.77, paid in April, 1870, when the deed of the farm was given, and which was a part of the purchase price. The payment was made by a check of Deuterman, to whom Theill had transferred the contract. The check was to the order of Theill, indorsed by him.

Croft testified that the money was counted out and laid on the table, and Williams took it up. Afterwards he stated that it was a check, draft or money which was paid. Laird testifies that the purchase-money was paid in two checks, both handed by Deuterman to Williams, in Marshall's office; and that the next morning Williams went over to the Westchester County National Bank, where, it appears, that a check of this amount was cashed on April 20, 1870.

Mr. Marshall, a lawyer in whose office the business was done, testifies that Deuterman, Laird, Croft, and others were present; that he was acting for Deuterman; that three checks were drawn by him, to order of Theill, and were signed by Deuterman and delivered to Theill; that he does not recollect Williams being there. Deuterman testifies that he did not hand the checks to Williams. Theill says that he handed the checks to Croft. The evidence, therefore, does not, we think, charge Croft, on the ground of his receiving the money. No receipt was given. Whether he is liable, on the ground of joining in the deed, will be considered hereafter.

Fifth. It is claimed that Croft should be charged with two payments of $1,000 and $1,500, respectively, made on the Ingersoll bond and mortgage. At the time of the conveyance of the farm to Deuterman there was an apparent lien by judgment thereon. For this reason a part of the purchase price, $6,694.68, was, by agreement, held by Mr. Frost in trust, until the judgment should cease to be a lien. Afterwards the sum of $5,000, part of this money,

was invested in the Ingersoll bond and mortgage, which was subsequently assigned by Mr. Frost to Croft and Williams, executors. And the question now presented relates to payments made and indorsed on that bond.

The first is that of $1,500, September 27, 1872; the other is that of $1,000, June 20, 1873. Both of these payments are indorsed on the bond; and the receipts therefor are signed by Croft as executor.

. Mr. Frost testifies that it is his recollection that, when judgment was about to be taken on a foreclosure of this bond and mortgage, he noticed that the indorsements were not signed; and that he asked Croft to sign them; that this was about May or June, 1875; and that Croft did sign them then.

Croft testifies that it is his impression that he signed these receipts all at one time. There are three receipts, one for $636.12, May 10, 1873, which money it is undisputed that Croft received. Croft testified, at first, that he never received any of the money mentioned in the three receipts. Afterwards he testified that he found that the $636.12 had been paid, in his absence, to his bookkeeper, from Ingersoll.

Ingersoll testifies that he made these payments to Williams. He even testifies (as to which he is plainly mistaken), that he paid the $636.12 to Williams. He has no memoranda or receipts.

The respondents urge the following facts. A receipt is produced, dated September 27, 1862, of $1,000, given by Williams to Croft as co-executor of the above estate. It is preceded by a statement of sums, alleged to have been paid by Williams, amounting to $901. The receipt is mutilated. It concludes, "in consideration upon the future settlement." They show also a deposit by Croft in his bank account, September 27, 1862, of $500, and they urge that these two sums make up the $1,500, paid that day.

Now, this receipt of Williams, given to Croft *as co-executor*, with its reference to future settlement, is evidence, of some weight, that Croft had at least $1,000 of the money of the estate from some source. And, as he kept no separate account, the $500 may well have been the residue of the $1,500. As the receipt is signed by him, his own evidence ought not to be enough to discharge him.

True, we have the testimony of Ingersoll. But he is admitted to have been mistaken as to the payment of the $636.12; which Croft acknowledges, on more careful examination, that he received. Why should Ingersoll be more accurate as to the other payments? And if Williams, in fact, received on September 27, this $1,500, what need was there that Croft, as co-executor, should advance him $1,000 more on the same day?

It seems altogether incredible that Willliams should have in fact received this $1,500 from Ingersoll, on September 27, and that, besides this sum, Croft, on the same day, as co-executor, should have advanced Williams $1,000, to meet alleged payments by Williams of $901. It is very probable, as Ingersoll says, that Williams was pressing for money. And if Croft received the $1,500, and at once gave $1,000 to Williams, Ingersoll may easily be mistaken as to the actual recipient of the money.

There was some evidence given tending to show that the indorsements were signed at the time of the foreclosure. The counsel who conducted the foreclosure was not certain as to this. And, therefore, we are at liberty to examine the probabilities freely. And we are unable to understand why it was needed, at the time of taking judgment of foreclosure, or at any other time, that the indorsements of money, paid on the bond, which had been made without signature, should then be signed. It was not pretended that these payments had been made to the attorney for the executors; so that he should need vouchers for his own protection.

The payments had been made to one, or the other, of the parties in interest; their own attorney was foreclosing; and no one disputed the fact of payment. The counsel's recollection was not perfectly certain, as he said, on the matter. If any one had desired to have the indorsements signed, it would seem probable that this would be Ingersoll, and not the attorney of the owners of the bond and mortgage.

At any rate, it is not very material when the receipts were signed. Whether signed at the time when the money was paid, or afterwards, they are evidence that Croft was the executor who had the money. We can hardly suppose that Mr. Croft's attorney would have asked him to sign receipts for money which he

had not had ; knowing, as a lawyer would know, the risk to which he thus exposed his client, by an act altogether unnecessary. On the whole, we do not think that Croft has satisfactorily done away with the presumption arising from his signature to the receipt for $1,500 ; and that he is chargeable therewith.

Next, in regard to the $1,000, receipted for as of June 20, 1873 ; much that has been said above applies to this also. The testimony of Croft and of Ingersoll is substantially the same, as to this item. His cash book shows a deposit June 23, 1873, of $1,060.

On June 24, only a few days afterwards, Croft paid to Williams $750, which, as in the former instance, indicates the possession of funds of the estate. The counsel for Croft, in answer to this, say that he had received May 10, 1873, from this Ingersoll bond and mortgage $636.12, the item above spoken of ; and that he thus had funds out of which he could advance to Williams the $750.

But the conclusive reply is that Crofts, in his account, credits himself, as of May 10, 1873, with this very sum of $636.12, as then paid to Williams, his co-executor. It is true that he did not prove this payment by any voucher. But his putting it in his account contradicts his claim that it made a part of the subsequent payment of $750. Therefore the $750 must have come from some other source. From what, if not from the $1,000 ?

For these reasons, more fully stated previously, we think that Croft has not done away with the presumption arising from his signing the receipt for $1,000 ; and that he is chargeable therewith.

Sixth. It is claimed by the respondents' counsel that, aside from the question of fact, as to the receipt of the moneys arising from the sale of the farm, Croft is liable for all the avails thereof, on the ground that he joined in the execution of the power of sale.

We do not think that this position is well taken. It was necessary for all the executors to join in the deed. (1 R. S., m. p. 735, § [112].) On the execution of the deed, one or the other executor must receive the money. And therefore the claim, contended for by the respondents, would make one executor liable, in spite of himself. For each ought to join in the execution of the deed, in order

to carry out the will of the testatrix; while, as both could not receive the money, one or the other would be liable for money which never had come to his hands.

Even in regard to property which one executor alone may transfer it is often reasonable that the other should join, to show his approval of the act. But it would be most unreasonable that, when none of the avails had come to his hands, he should be chargeable, merely for approving of the transfer.

The testatrix, in this case, placed confidence in each of the executors; and gave to each the power with which the law clothes such persons. It is enough to hold each responsible for the faithful application of such part of the estate as he actually received, when it was sold under the power. We think that this rule is sound, although there have been some deviations from it. (1 Perry on Trusts, § 420 *et seq.*)

*Seventh.* The respondents urge again that Croft so negligently managed, and so carelessly permitted his co-executor to waste the estate, that he should on that ground be held liable for all the assets which he might have cared for and preserved. (*Clark* v. *Clark*, 8 Paige, 153; *Elmendorf* v. *Lansing*, 4 Johns. Ch., 562.) The doctrine on which the respondents rely, is stated in *Adair* v. *Brimmer* (74 N. Y., 539, 566). The important question is the application of the doctrine to the facts of the case.

Letters testamentary were issued in May, 1868. Croft knew, before the death of the testatrix, that Williams, his co-executor, was pecuniarily involved. He says that he did not account him solvent; but declines to fix the time when he thought him insolvent. He testifies that Williams received $1,167.77 (the sum above spoken of) with his consent, and in his presence; and that he then knew him to be entirely irresponsible. He testifies that he knew, within a few months after the testatrix's death, that Williams was badly cramped, and had been trying to compromise his debts; and that, in his own business, he would not have trusted a man in such condition. He testifies that Williams crowded him, because he was hard up and cramped. He heard that the going west of Williams's father-in-law cost Williams $600, and a piano $600. Again, he testifies that he knew that

Williams was using the money for himself and his family; that he advised him to invest the money, but did not understand that Williams did so; or that he kept a separate account. He testifies that he made no inquiry as to the debts of the estate; or as to how much of them Williams paid. That Williams was sometimes in the tobacco, and sometimes in the crockery business, and his crockery store would not have brought $300. That he was continually wanting money. That he did not think the $1,167.77 would last Williams long.

Now, without going over the evidence in any further detail, it is evident that, from the first appointment of the executors, Croft knew that Williams was an embarrassed and insolvent man. And that, under the knowledge of this fact, instead of taking care of the avails of the sale of the farm, he allowed them to go into Williams's hands, without any good reason to believe that they would be properly applied. It is very plain also that, in fact, the avails which passed into Williams's hands were not properly applied. The account of Croft contains items of board and clothing paid for the children. But we do not see that proof is given that Williams used for their benefit the money which thus came to his hands.

We think, therefore, that such negligence and want of care have been shown, on the part of Croft, that he should be held liable also for the item above-mentioned under the fourth head, of $1,167.77, in having permitted this money to go into the hands of an insolvent co-executor, when he had reason to believe it would not be properly used.

The decree should be modified accordingly, with costs against appellant personally.

Present—LEARNED, P. J., BOCKES and WESTBROOK, JJ.

Decree modified, with costs, against appellant (executor) personally. Order to be settled before LEARNED, P. J.