### ANDERSON v. FRY et al.

(Supreme Court, Appellate Division, Second Department. December 23, 1907.)

1. DEEDS—GIFTS—VACATION—EVIDENCE.

In a suit to set aside a legatee's deed of a portion of her interest in an estate to her brother, who was one of the executors and trustees, evidence *held* insufficient to show that such legatee was not fully informed as to the amount of her interest in the estate, or that the deed was not executed by her voluntarily and with full knowledge of its force and effect.

2. GIFTS—VALIDITY.

A voluntary transfer or gift of a portion of a legatee's share in an estate to her brother, who was one of the executors and trustees of the fund, if voluntarily made with knowledge of all the facts, is protected to the same extent as a transfer for full consideration.

3. DEEDS—CONVEYANCE—TRUSTEE—BURDEN OF PROOF.

A beneficiary in a trust fund conveyed a portion of her interest to the trustee by a voluntary deed. Seventeen years after such conveyance, and seven years after her death, without any rescission of the transfer or explanation of delay, the representatives of the deceased beneficiary sued to set aside the conveyance. *Held*, that the trustee's personal repre-

sentatives were not required to show that the conveyance was made by the beneficiary with full knowledge of all the facts and of the effect of the conveyance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 16, Deeds, §§ 562–594.]

Appeal from Special Term, Kings County.

Action by William B. Anderson, as ancillary administrator of the estate of Mary Elizabeth Purkess, deceased, against John C. Fry and another, as executors of the estate of John C. Fry, deceased. From an interlocutory judgment setting aside a deed and for an accounting, defendants appeal. Reversed on both law and facts.

This case has been on appeal here before, but the merits were not decided. 116 App. Div. 740, 102 N. Y. Supp. 112.

John and William Fry came to this country from England in or about 1860, and resided here thereafter. William died in 1878, and his will was probated in New York county, in this state, where he resided, in the same year. They left behind them in England three sisters, Sarah (who became Mrs. Billett), Mary (who became Mrs. Purkess), and Rhoda; also another sister who did not survive William; and a brother James. The family was in ordinary life and without property of any amount. William accumulated a considerable fortune in this country. He left a legacy to each of his said brothers and sisters, viz., $50,000 to his brother John, $25,000 to his brother James, $25,000 to his sister Sarah, $25,000 to his sister Rhoda and $12,000 to his sister Mary; and $25,000 to his cousin Herbert Fry, who also lived in England. He also created a trust of $10,000 in his executors as trustees to pay the interest thereon to his uncle John Billett for life. He gave the "residue and remainder" of his estate to his said brothers and sisters and cousin Herbert, share and share alike. He then in a separate bequest gave the said principal of $10,000 of the said uncle Billett trust to his said "residuary legatees," i. e., his said brothers and sisters and cousin, on the expiration of the trust. He appointed his said brother John (with him in this country) and seven other persons his executors. Several of them acted as such with the brother John, the precise number not appearing.

This suit is by the ancillary administrator of Mary's estate to set aside a deed of gift by her to her said brother John, while he was acting as executor, of part of her share under the said will of William, and for an accounting. John died on October 29th, 1894, a resident of Brooklyn, N. Y., and letters testamentary were issued to his executors in Kings county. Mary died intestate on December 19th, 1897, letters of administration were granted in England to her husband, Mr. Purkess, and ancillary letters were granted thereon in Kings county. The said executors of John (who are his two sons) are the defendants.

(1) John sent a draft for the said legacy of $12,000 to his sister Mary in England on or about May 20, 1879, on the return to him by Mary of the receipt for it dated May 5, 1879, which he had sent to her to sign in advance of payment; and at the same time he paid the said legacies to his said other two sisters and his brother James and cousin Herbert in the same way.

(2) On June 12, 1879, Mary wrote a letter to John from Southampton in which she returned to him the receipts of herself and her said two sisters for $25,000 each out of the residuary, dated June 6, 1879, the same having been sent to them by John to be signed and returned in advance of the payments. In that letter she wrote: "If there should be anything more after this to come to me I should like you to keep it out there and invest it for yourself or the children," i. e., his children.

(3) After receiving this letter John wrote a letter to the three sisters, dated July 5, 1879, beginning "My dear sisters." The envelope was addressed to and received by Sarah (Mrs. Billett) at her house in Southampton. In the letter he wrote to them that he enclosed "three drafts, one for each, equivalent to $25,000, your receipts for which were duly received," i. e., by Mary's letter above mentioned. He also enclosed three powers of attorney by each of them to him for them to sign before the United States consul and return to him to enable him thereafter (as he wrote in substance) to do all the business without

getting new papers from them every time he had to act for them. He wrote that he had sent the same paper to their brother James and cousin Herbert, the other two residuary legatees. He also wrote: "These papers is to give me power to purchase for you your share of those Harlem mortgages as we agreed when I was with you last summer." And further: "It will not be necessary to sign any more after this as I shall be able under it" (the said power of attorney) "to collect all the remainder due to you and send it to you from time to time." And also: "Your share of the mortgages will be about $30,000 each, this will bring you 6 or 7 per cent. payable half yearly." He says he has also written to James, and that they can talk with James, who will explain the matter to them if they do not understand it. He advises them to invest all he has remitted to them in United States 4 per cent. bonds or else in British consols, and to give their banker instructions to purchase the same for them.

(4) At the time this letter was received by Sarah, the sisters Mary and Rhoda were living or staying either permanently or for a time with her at her house in Southampton, and the brother James came there upon its receipt, and they all met and consulted, and went to the banker together and gave him orders to buy the consols. Cousin Herbert also came on the same occasion and stayed two days, and talked with them about the matter. This all appears by a letter of Sarah to John dated July 24, 1879, which was in answer to John's said letter of July 5, 1879, to the three sisters. She also encloses with that letter the said three powers of attorney which he had sent for execution by the three sisters. They had all gone together with James before the United States consul and executed them, and also to the banker and ordered him to invest their money in consols. She writes also that James and Herbert mentioned about the expense of "these papers," the powers of attorney, and that "we" want to pay the same. She then writes: "You say there will be more money due to me do not send me any more what is my share for the future I wish you to invest for yourself or for my namesake as I have more than ever I shall live to spend and I rather you have it I have told them all this is my wish."

(5) Sarah's evidence was taken herein by commission. She testifies that John used to write to all three sisters as he did in the said letter of July 5, 1879, and the one that got the letter would show it to the others, and that she showed this letter to Mary and Rhoda.

(6) Also, on October 22, 1903—six years after Mary's death—her son wrote to his cousin, the defendant John C. Fry (son of the said John Fry, and one of his executors), as follows: "I have discovered a letter written by your father dated July 5, 1879, informing my mother that her share of the Harlem mortgages which were agreed upon when your father was in England in 1878 was $30,000." This is the same letter which is mentioned above of that date, and informing the sisters that the share of each in the mortgages would be $30,000. The plaintiff produced it on the trial in response to a notice by defendants to do so. There is a dispute on the evidence whether Sarah's husband gave this letter to Mary's said son, or whether he found it among his mother's papers.

(7) Rhoda also gave to John all future sums coming to her from the estate, as appears by a letter by her to John dated Southampton, March 25, 1882. She wrote: "I told you to keep the money for yourself and only send me the interest. * * * Whatever you like to do with the money for yourself you do it and send me the interest that is all I want." She encloses a copy of her will without giving its contents. After her death it was found that she made a later will, leaving everything to John and his family.

(8) On August 9, 1880, Mary executed and delivered a deed of gift to John of all money or property he then had in his possession belonging to her and collected from the executors of William, or might thereafter collect or receive from the said executors on her account, "together with all my right, title and interest in and to all and every part of the remaining or residuary estate" of the said deceased.

At this time Mary, who was 39 years old, was engaged to be married to Mr. Purkess, and they were married 3 months and 20 days later, viz., on November 29, 1880.

(9) On September 4, 1880, Sarah executed and delivered to John a similar deed of gift. Rhoda did also, but the date of hers does not appear.

(10) In or about August, 1880, John went to England, and visited his three said sisters at Sarah's house in Southampton. He was with them less than a week.

(11) On November 10, 1880, John (having returned home) wrote to Rhoda as follows: "I am glad to say all the property is doing nicely all rented and everything going on satisfactorily you will soon receive a notice from the court here that we are ready to settle our accounts as executors, it will not be necessary for you to take any notice of it as I attend to it for you a notice will also be sent for Sally and Mary it is just a matter of form and requires no answer."

(12) On December 10, 1880, Rhoda wrote a letter to John saying among other things as follows: "We received the court papers you spoke of but we shall take no notice of them."

(13) On December 19, 1880, Mary wrote to John from Reading (where she lived after her marriage) among other things as follows: "I saw the manager of the bank and I have decided to let everything remain as it is in my own name. I shall be able to explain to you when I see you again, and if you will be kind enough to let me know what I owe for making out the draft I will send you an order for the amount, and I am much obliged for the trouble you have taken." This "draft" it was agreed on the trial meant a draft of her marriage settlement, she having been married a few weeks previously to Mr. Purkess.

(14) On February 11, 1881, John wrote to Rhoda enclosing her a draft equivalent to $453.68 for interest and "rent for Harlem property." He also informed her that all incumbrances on the Harlem property have been paid off and that her share of the rent thereafter will be about £20 per month.

(15) On March 15, 1881, John wrote to Rhoda as follows: "The estate is now all settled up and all the money divided. I received for your share $3,-283.36. I have invested this for you with the other and will send you the interest ½ yearly as you requested." This sum was the final sum to each in the distribution, as appears by the account.

(16) On March 24, 1884, John wrote to Rhoda enclosing a draft for £204 for interest, and informs her that he expects that the money from which uncle Billett's interest came will be paid over to the executors soon, as they had given notice to the parties who had it on interest to pay it over, and that her share will be one-sixth of the $10,000. He also says he will invest it for her and send her the interest, unless she wants him to send the principal, in which case he will send it if she will let him know. This has reference to the said $10,000 put in trust with the executors by the will for uncle Billett for life. He had recently died.

(17) On April 14, 1884, Sarah wrote to John acknowledging a letter and draft for money, and in which she wrote concerning this same trust fund of $10,000 as follows: "With respect to uncle's money, my share you keep it there at interest as you say and when you come we will see about it. Rhoda received your letter sent by this mail no doubt you sent to Mary same time as you sent to us and if so she will write to you."

(18) On March 14, 1887, John wrote to Mary acknowledging receipt of a letter written by her husband in her name asking for her one-sixth share of the Billett trust fund of $10,000, and enclosing a draft therefor. It does not appear whether she requested or authorized her husband to write the letter.

(19) On October 4, 1900, Mary's widower wrote to John's son, one of the defendants, among other things, that he had seen the will of Rhoda, who had died; that it left all her property to John and his family, and if her property was not divided among the next of kin he would contest the will.

(20) On October 22, 1903, the son of Mary wrote to his cousin, the defendant John C. Fry, calling on him to account for the share of the writer's mother, Mary, in the said William Fry's estate, as he could use the money to advantage in his business on the London stock exchange. This letter has already been referred to above, as the one the writer wrote of as "informing my mother" that the share of each in the mortgages would be $30,000. His mother had died nearly six years before, namely, on December 16, 1897.

(21) After the execution of the three deeds of gift by the three sisters to John he continued to send the interest on Rhoda's share to her, and an annuity of £400 a year to Sarah.

(22) This action was begun on October 28, 1904, which was more than 24 years after the deed of gift by Mary to John was made, and 7 years after Mary died.

(23) At the time of the commencement of this action all of the executors and their attorneys and counsel, and all of the residuary legatees under the will of William excepting Sarah (Mrs. Billett), who was about 76 years old, and the United States consul at Southampton, who took the acknowledgments to the various papers from time to time, had died.

(24) The sums which John received from the executors of William and kept, and which the defendants claim he had a right to keep under the deeds of gift, were in the case of Mary, as well as of the other two sisters, $10,000 on September 9, 1879, $10,000 on June 22, 1880, $21,058.34 on January 1, 1881, and $3,283.36 on February 28, 1881, making a total of $44,341.70.

(25) Mrs. Billett in her deposition testifies that Mary told her she had given her share to John, also that Mary knew that Rhoda had done the same.

(26) In the power of attorney (dated July 18, 1879) and the deed of gift (dated August 9, 1880) Mary describes herself as residing in Southampton, where Rhoda also lived during the same time, and the only place that they appear by the evidence to have lived there was at the home of Sarah (Mrs. Billett). After her marriage Mary lived at Reading with her husband. She had been a parlor maid and he was a butler.

(27) The said power of attorney of each sister to John in terms authorized him to receive for the sisters any money or property that thereafter came to them from the executors of the estate of William, and also to invest the same for them. It also authorized him to consent to a partition of the residuary estate, and to sell real and personal estate, and to receive bonds, mortgages or other securities in such division and sell the same and reinvest. This is the instrument on which the trust established by the judgment herein is based, and, as has been said, the deed of gift was executed about a year later.

The claim of the complaint is that all of the said moneys was received by John as trustee under the said power of attorney, and that he always held the same thereunder. The claim of the defendants is that Mary (like the other two sisters) made a gift thereof to her brother John.

Argued before HIRSCHBERG, P. J., and WOODWARD, RICH, MILLER, and GAYNOR, JJ.

L. A. Gould, for appellants.

Howard Taylor (William B. Anderson and William Williams, on the brief), for respondent.

GAYNOR, J. A purchase of the trust property by a trustee of himself, or at his own sale, or even at a judicial sale, is voidable at the mere election of the beneficiary, within a reasonable time, without regard to its fairness (Davoue v. Fanning, 2 Johns. Ch. 252; Jackson v. Walsh, 14 Johns. 407; Conger v. Ring, 11 Barb. 356); but a gift or sale of the trust property by a beneficiary to his trustee does not come under this rule. It is not voidable at the election of the beneficiary, but may only be set aside by a court of equity at the suit of the beneficiary for fraud, undue influence or unfairness. The only distinction between such a suit and a similar one not by beneficiary against trustee is that the burden of proof is on the trustee to show that the transaction was free and fair. Nesbit v. Lockman, 34 N. Y. 167; Graves v. Waterman, 63 N. Y. 657; Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430; Pickslay v. Starr, 149 N. Y. 432, 44 N. E. 163, 32 L. R. A. 703, 52 Am. St. Rep. 740.

The learned trial judge found as a fact that Mary, the beneficiary, knew that the instrument she executed—viz., the deed of transfer or gift by her to her brother John—purported to assign to him her remaining interest in the residuary of the estate of her brother William; John being at the time an executor of the said estate, and also her agent by power of attorney to collect and invest her share thereof. There is no finding by the learned trial judge of any affirmative act of fraud or undue influence by John upon Mary, and there could be none on the evidence. The judgment rests on a finding of fact that he "failed to disclose, and thereby concealed from her, material facts bearing upon the nature and value of the property" she transferred to him. This finding is erroneous. The evidence is to the contrary. Although the burden of proof be regarded as on the defendants (of which something remains to be said because of the delay in bringing this suit), some leniency therein was meet after the lapse of 24 years from the making of the gift and the commencement of the suit, during which time the transaction was never questioned by Mary who lived for 17 years after it, or by any one during her life or afterwards, and all of the several persons who had any knowledge of the transaction, save one (her sister Sarah) had died, and the written evidence concerning it had frittered away. But the evidence produced, although made up of odds and ends got together with difficulty after the lapse of a generation, was ample, without invoking such leniency, to show that the gift was free and voluntary; that the intention to make it arose and matured in the mind of the beneficiary without any suggestion from the trustee; that he did not conceal from her the amount of her share of the estate, but discovered the same to her; and that she made the gift with full knowledge that it was large, and of the approximate amount of it.

In her letter of June 12, 1879, to her said brother John, she expresses a gathering if not an already gathered intention of giving to him the remainder of her share. "If there should be anything more after this to come to me I should like you to keep it out there and invest it for yourself or the children," she writes. In this letter she acknowledges receipt of $12,000 (her specific legacy of that amount) which had already been sent to her, and encloses three receipts of herself and her two sisters signed in advance for $25,000 more for each out of the residuary. The learned trial judge overlooked this fact, and says that she then only knew of the $12,000, and thought that it was substantially all that she was to get. But if her letter suggests any lack of knowledge by her, we have in the letter which her said brother wrote to her and her two sisters after the receipt of it, viz., on July 5, 1879, and accompanying the drafts for $25,000, absolute proof that he had no thought of taking advantage thereof; no thought of deceiving her by concealing from her the substantial magnitude of the amount of her share remaining. He writes concerning the mortgages of the estate, and says that the share of each of them therefrom will be $30,000, not $20,000 as the learned trial judge inadvertently says. This alone disclosed to the sisters the substantialness of their remaining shares. It completely disposes of the claim which prevailed below, that when Mary made the deed of transfer or gift of her remaining share to her

said brother about one year later, viz., on August 9, 1880, she thought that she had already received substantially the whole of her share in the two payments to her of $12,000 and $25,000, and that only a comparatively unsubstantial amount remained. It is true that when all of the assets had been entirely marshalled and liquidated a year and a half later still, the remaining amount for each was shown to be $44,000; but the essential thing is that the sisters, the same as the two other residuary legatees, viz., the brother James and cousin Herbert, were informed, by means of the said letter, if in no other way, before the making of the said deed of transfer, that they still had a very large amount, comparatively, coming to them. Probably no one knew what would be the full amount when everything was liquidated, including odds and ends and interest, but they all knew from this letter, at least, without regard to any growth of their knowledge on the subject during the year between the writing of the letter and the making of the deed of transfer, that it would not be trifling or small, but substantial—in fact, very large, compared with the amount already received; that out of one class of assets alone $30,000 would be realized for each. It is impossible to say that while the sisters would make the gift (for the other two did the same as Mary) knowing it to be $30,000, they would not if they knew it to be more.

But this letter does not stand alone. The tenor of all of the letters and acts of the trustee is so uniformly one of frankness and honesty that it would falsify a finding of fact that he cheated his sisters by concealing from them knowledge of the substantial amount of their shares. Why should he conceal it? He never asked them to give him their remaining shares. He lived 3,000 miles away from them, and they voluntarily, and without a suggestion from him, wrote to him that they gave him such shares. And when we bear in mind that their brother James and cousin Herbert, who lived near them, and with whom they were on terms of intimacy and affection, and with whom they advised about the estate, received their shares in full by payments made from time to time after the said deed of transfer was made, we would be taxing credulity beyond what it could bear to believe that they never told the amounts they received to the sisters. Were they in a conspiracy of silence and concealment with their trustee to cheat the sisters? It is to be presumed that family matters in which all the members of the family are taking part, and consulting together about, are known to them all. The trustee should not be disgraced after his death by adjudging that a family arrangement which has gone unquestioned for a generation was procured by him by a breach of trust by him to his sisters, without the most careful consideration if not hesitation.

But it is said that it is not proved that Mary ever saw the said letter or was informed of its contents. The three sisters were living together in affection and concord at Southampton, England, in the home of the one of them who was married, Mrs. Billett. The letter is addressed "My dear sisters," and in it the writer says he encloses the three drafts of $25,000, one for each. The envelope was addressed to Mrs. Billett. The learned trial judge says there is no evidence that she "transmitted" the letter to Mary, overlooking that the sisters were all living together,

and that it was not until after Mary was married that she went to live at Reading with her husband. Mrs. Billett is still alive out of all of the six residuary legatees, several executors, the lawyers of the executors and others, the United States consul who took the acknowledgments to the deeds of gift, powers of attorney and other papers; and testifies that she showed the letter to her two sisters. She says that it was usual for the brother to write to them all by one letter, and that the one who received it would show it to the others. But in addition to this we have the conclusive fact that Mary and her two sisters, and the brother James and cousin Herbert (the other two residuary legatees in England, who had also received a similar letter and drafts for the same amount), had a family meeting at Mrs. Billett's house on the receipt of the letter, and discussed the information and advice contained in it. They also went to the bank together—the three sisters and the brother—and invested their money as advised to do in the letter; and they executed and returned to their brother the powers of attorney by each of them to him which he enclosed with the said letter to them for execution to enable him as he wrote to thereafter deal with the estate without being obliged to get new papers from them every time he had to act for them. To hold in the face of all this that there is no evidence, or that it is not proved, that Mary had knowledge of the contents of the said letter, is to set at naught evidence which according to every day life, and what we all know of the common relations of family life, is conclusively to the contrary. It was found below that Mary did not read the letter or know of its contents. There is no more reason to say that of her than of the others, and that would be conceded folly. If Sarah (Mrs. Billett) had not testified that the letter was shown to Mary, the fact would be obvious from the other facts. And there is no reason to doubt her evidence. That it is not contradicted by direct evidence, nor by any inferences from evidence, and is not surprising or suspicious, nor improbable, but inherently probable, requires that it should not be disregarded. Hull v. Littauer, 162 N. Y. 569, 57 N. E. 102.

And the giving of the powers of attorney of itself meant that they all knew that what remained of the estate was considerable. They were not given merely to deal with a remaining trifle after the estate had been substantially administered and divided.

It is said that it is incredible that Mary would have made the deed of gift if she had known that there was a substantial amount still to come to her. And yet her two sisters did the same thing without suggestion or request from their brother and trustee, but wholly on their own initiative, as their letters to their brother 3,000 miles away show, and as Mary in all probability, and according to the testimony of Mrs. Billett and her letter of July 24, 1879, knew. While their preference toward their brother may seem extraordinary, it must be remembered that in England, growing out of the rule of primogeniture, the family tie and family pride is very strong, and the notion of a family head possessing the bulk of the family property is the general and controlling one. The three sisters were fairly educated, intelligent and prudent, as their letters show, and at the time Mary executed the deed of gift she was 39 years old. That she was then

engaged to be married and was married within four months there-after, does not annul the fact that she did execute the paper.

It is also said that Mary's letter to her said brother of December 10, 1880, proposing to pay for the draft of her marriage settlement which he had drawn at her request and sent to her, shows that she could not have been aware that she had only four months before made him a gift of such great magnitude. But we find the other two sisters, who had made the same gift to him, uniting with their brother James and cousin Herbert in proposing to pay their brother the expense of the powers of attorney they had executed before the American consul. English formality and punctiliousness required that they should make the suggestion of payment, however well they knew it would not be entertained. We must not judge their conduct by what would be improbable elsewhere.

The payment by the trustee to the sisters of the one-sixth share of each in the fund of $10,000 set apart by the will with the executors in trust for uncle John Billett, for him to receive the income of it for life, and then be divided by the trustees among the residuary legatees, which trust terminated in 1884, was not inconsistent with the fact of the gifts by the sisters. The deed of gift was in terms confined to the residuary estate, to such moneys and property as the executors had collected or should collect or have for the residuary, whereas the trust fund was set apart and was a separate fund out of the residuary fund and could never go back into it and thus return to the hands of the executors as such. It is true that the executors were the trustees, but nevertheless they did not hold the fund as executors. If (to illustrate) the executors had all died, the fund would not have gone to an administrator with the will annexed, but to a trustee appointed by the court, and by the terms of the trust he would not on the death of the beneficiary pay the fund to the administrator to go into the residuary, but would himself divide it among and pay it to the residuary legatees. It was not a part of the residuary estate, and the executors, as such, could never get it back, but had to divide and distribute it as trustees under the trust clause of the will.

It would be easy to make too much of the letter of John to the sisters, or one of them, that they need not take any notice of the citation to the executors' accounting, as he would attend to it. This, though a thing not to be encouraged, is often done with no wrong intention; and where there is a dishonest intention it is not done so directly and openly.

There are three rules of law which govern the case in the aspects in which it stands on the facts:

1. If the beneficiary was substantially informed of the magnitude of the gift she was making, her deed of transfer must stand; for it was found below that she knew of the purport of the instrument, and there were no undue influence or affirmative statements or acts of fraud. The cases on this head have already been cited. A voluntary transfer or gift is as much protected by law as is a transfer or contract for a full consideration. Pickslay v. Starr, 149 N. Y. 432, 44 N. E. 163, 32 L. R. A. 703, 52 Am. St. Rep. 740.

2. She was bound to promptly claim a rescission of her deed of transfer, and if necessary begin a suit to rescind it, on learning at any time substantially of the amounts paid to other residuary legatees, if she claimed to have made it by reason of a concealment of facts by the trustee; and a failure to do so ratified it.  Masson v. Bovet, 1 Denio, 69, 43 Am. Dec. 651; Cobb v. Hatfield, 46 N. Y. 533; Strong v. Strong, 102 N. Y. 69, 5 N. E. 799.  This rule applies between trustee and beneficiary; but where a trustee purchases the trust property of himself, or at his own sale, there may be no requirement of such prompt objection by the beneficiary, for the trustee may be presumed to have made the purchase in the interest of the beneficiary, which cannot be so when the beneficiary makes the sale to him; but even in the latter case delay ratifies the transaction.  Adair v. Brimmer, 74 N. Y. 539; Harrington v. Erie County Savings Bank, 101 N. Y. 257, 4 N. E. 346; Kahn v. Chapin, 152 N. Y. 305, 46 N. E. 489.

3. After the lapse of a considerable time the rule putting the burden of proof on the trustee does not apply without some evidence on the plaintiff's side at the outset showing ignorance of the facts by the beneficiary when he made the gift or sale.  To quote from a case of highest authority:

"The plaintiff is not entitled to a strict application of the equitable rule, which she might have invoked if she had moved with some degree of diligence to set aside the agreement and release, and to demand an accounting.  An acquiescence for sixteen years requires some explanation.  If it was due to an ignorance of the facts for which the executors were responsible, it should have been shown."  Geyer v. Snyder, 140 N. Y. 394, 35 N. E. 784.

The delay in the present case was 17 years during the beneficiary's life and 7 years after her death.  There was no evidence on the plaintiff's side in explanation or excuse of the failure to rescind the deed of gift and bring a suit for that purpose, and the burden of proof was therefore not on the defendants, although the case was decided and has been reviewed in this opinion, on the theory that it was.

The judgment should be reversed on both the law and the facts.

Interlocutory judgment reversed on the law and the facts, and new trial granted; costs to abide the final award of costs.  All concur, except HIRSCHBERG, P. J., not voting.