BEATRICE C. SHIVERICK, Appellant, v. SEYMOUR W. BONSALL, Respondent.

Second Department, December 13, 1918.

**Guardian and ward — agreement by stepfather with daughter who had just become of age to lease from her a manufacturing plant constructed at her expense, construed — suit for an accounting — effect of delay and ratification upon right to rescission — evidence — discovery — right to inspect private check book and accounts — right to proceeds of insurance.**

In a suit for an accounting it appeared that the plaintiff, who had always acted under the counsel of the defendant, her stepfather and testamentary guardian, not having any other adviser, a few months after becoming of age and after receipt and deposit in her own name of cash and securities, purchased upon the advice of the defendant a site for a manufacturing plant; that thereafter plaintiff and defendant entered into a written agreement providing, in effect, that the defendant should construct a manufacturing plant upon the site, to be paid for by the plaintiff who was to give him a lease of the land and buildings; that from time to time plaintiff's moneys were used in this construction and her securities sold to meet the advancing outlays; that thereafter she married and her husband was made vice-president of defendant's operating corporations; that later, part of the plant was totally destroyed by fire, leaving the remaining buildings unavailable for manufacturing, and the insurance money was placed on deposit, and that the plaintiff in her complaint verified nearly three months after the fire set out an action for an accounting against the defendant as trustee. Evidence examined and

*Held*, that had an action been seasonably brought to disaffirm the entire transaction, plaintiff might have contended that as she had just emerged from her minority and was still under the influence of defendant as her stepfather and testamentary guardian, a transaction of this kind should

be set aside, but her delay, knowledge, approval and ratification of the transaction are a bar to affirmative relief by rescission.

Applications during the trial to look at defendant's private check book and his private accounts were properly denied.

The plaintiff having herself paid the insurance premiums is entitled to the proceeds collected.

She may elect to regard the destruction of essential portions of the plant as a frustration of the entire object of the proposed adventure, and hence the judgment should recognize her right to withdraw from any reinvestment. She should have the right to terminate the investment by a sale or other disposition free and clear of all rights of the defendant.

MILLS, J., dissented, with memorandum.

APPEAL by the plaintiff, Beatrice C. Shiverick from an interlocutory judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Westchester on the 25th day of July, 1916, upon the decision of the court after a trial at the Westchester Special Term.

The suit was brought for an accounting and it was adjudged that the plaintiff had full title to certain property at Bayonne, N. J., without any right to disaffirm such purchase, or a subsequent contract for the improvement thereof; that the defendant had sustained the burden of showing the fairness of his transactions with his stepdaughter, the plaintiff, which transactions plaintiff had confirmed. Provision was made for an accounting of all moneys that defendant under a power of attorney had withdrawn from plaintiff's bank account. Subject to the result of such further accounting, it was found that plaintiff owed defendant on his counterclaim $64,705.67, with interest from June 2, 1915, against an indebtedness by defendant to plaintiff for interest of $54,258.73. The court decreed that on plaintiff's rebuilding certain burned structures defendant should take a lease thereof. It also adjudged to plaintiff $84,959, and to the Precious Woods Handling Company $14,815.23, from the proceeds of fire insurance.

Without entering upon the accounting, plaintiff appealed here from each and every part of this interlocutory judgment.

The plaintiff, eldest daughter of Frank Cornell and Emma Van Deusen Cornell, with a younger sister, lost her father when between two and three years old, after which her mother married the defendant. The stepdaughters became members

of the defendant's family. Their mother died in December, 1901, when plaintiff was eleven years old. Her will left defendant property valued at $300,000.

Defendant, for some fifteen years, had been interested in making wardrobe or innovation trunks. He had purchased about seventy acres of land at Mamaroneck for an intended factory site, but finding it unsuitable had later used a rented property in The Bronx. Through different corporations that he controlled, he was engaged in importing material for trunks and veneers from South America, which made desirable a waterfront site. The subject of the Mamaroneck venture and the other proposed plans had been mentioned to plaintiff. On January 18, 1911, plaintiff came of age, and entitled to part of the principal of the trust funds held by trustees for her benefit. In the following March, less than two months after attaining her majority, defendant described to her the advantages of a waterfront property near that of the Texas Oil Company, at Bayonne, N. J., whereon defendant planned to erect mills and other buildings for his manufacturing purposes. He spoke of the matter as an investment so good that it should not go out of the family. Plaintiff had always acted under her stepfather's counsel, not having any other adviser. She had consulted no lawyer about her investments.

On March 7, 1911, the trustee under the will of plaintiff's grandfather accounted and turned over cash and securities, which plaintiff deposited with the Knickerbocker Trust Company in a new account that she opened. Subsequently she gave defendant a general power of attorney to sign in her name checks and notes.

On the same day she signed an agreement with the Terry & Tench Company, as vendor, to buy this Bayonne tract of nine and twenty-four one-hundredths acres, with shore front rights, making a cash deposit on the full purchase price of $133,650, which later was consummated by a deed conveying to plaintiff the property. Other trust funds which became payable to plaintiff were also placed in her account with the Knickerbocker Trust Company.

Defendant amplified to plaintiff his plan to have mills on this property to make wardrobe trunks and also to cut veneers. When the structures should be completed he was to lease

them for a rental at six per cent on her investment. She approved and accepted the suggestion. The learned trial court, on sufficient evidence, has found that this land was worth the purchase price, and that at the trial in 1916 it was worth at least $225,000.

After the plans for factory buildings had been prepared, and erection actually begun, plaintiff and defendant entered into a written contract prepared by an attorney who was a friend of the family. It was dated July 6, 1911, and provided, in brief, that defendant should put up improvements on the property without limit or restriction, for which outlays he was to render plaintiff a detailed account. Plaintiff was to repay him the cost of all such improvements. Upon completion of them, plaintiff was to give defendant a thirty-year lease of the land and buildings for a yearly rental of six per cent upon the purchase price, and the cost of said improvements. Defendant was to pay taxes, assessments and water rents with a right to assign the lease and to sublet the premises, or any part thereof. Before the buildings should be finished, plaintiff had the risk of fire loss, and defendant was to make over to her the proceeds of all insurance, as soon as collected.

The court, at Special Term, found that this purchase and this agreement were voluntary and were entered into with full knowledge and without fraud, over-reaching or undue influence. Besides a finding of good faith, he found that the transactions were beneficial to the plaintiff.

From time to time plaintiff's moneys were used in this construction and her securities were also sold to meet the advancing outlays. Insurance was taken out payable to plaintiff and/or the defendant, and/or the Precious Woods Handling Company, an operating company controlled by defendant which owned material on the premises.

On March 24, 1913, plaintiff married Mr. Shiverick. Defendant made a wedding gift to Mr. and Mrs. Shiverick of his house at Rye, which was valued at $150,000. In the beginning of this married life defendant also advanced money for the household expenses, which were to be apportioned between the occupants of that residence. Mr. Shiverick, plaintiff's husband, was made vice-president of defendant's operating corporations at Bayonne. The dates of completion

of the structures on this property ran from November 25, 1911, to the finishing of the second trunk factory on September 1, 1914.

For the purpose of separately allotting the land between these different shops, the court thus apportioned the original purchase price:

| | |
|---|---:|
| Sawmill and storage yard.................. | $74,240 46 |
| Veneer mill............................... | 14,848 09 |
| Planing mill.............................. | 29,696 19 |
| First trunk factory....................... | 7,424 05 |
| Second trunk factory..................... | 7,424 04 |
| | $133,632 83 |

These original costs, plus the structure outlays, formed a basis for interest from the completion of the several buildings. As thus completed, the Special Term found defendant's liability for interest rental as $54,258.73.

During a part of the year 1914 defendant was absent in Europe, returning just after the outbreak of the war. The family harmony about this time became disturbed over questions of money for the household and because of other domestic differences.

On January 11, 1915, the sawmill, veneer mill and power plant were totally burned, save for slight salvage, leaving the saved buildings unavailable for manufacturing. The insurers paid $101,242, which, less charges, was placed on deposit.

In the following March plaintiff's attorney, who had called on defendant for information, was told that all plaintiff's funds in the Knickerbocker Trust Company had gone into the Bayonne property, except five Bethlehem Steel bonds. Defendant also stated that he had also between $80,000 and $90,000 outlays there, which had not been reimbursed. At the attorney's request, defendant began to prepare an account of these outlays.

The amount expended at Bayonne on these properties was found to be $265,694.86, which, added to the cost of the land, made an aggregate of $399,344.86.

The complaint in this action, verified April 2, 1915, nearly

three months after the fire, set out an action for accounting against defendant, as trustee. It charged that defendant had control of the securities obtained from the Fulton Trust Company, plaintiff's guardian, of about $320,000, with like averments as to other inherited properties. The plaintiff's position was one of complete ignorance, in which she asked defendant as a trustee for an account " of the money and property belonging to her in his possession and control, although she demanded the same several months ago."

The answer set up the facts of the plaintiff's purchase from the Terry & Tench Company, the contract for improvements, the expenditures made, and the fire loss, with the insurance collections. Defendant also counterclaimed for $77,025.61, as a balance of indebtedness.

When the testimony disclosed that the plaintiff had been the principal in the Bayonne transactions, with the subsequent contracts, and had herself deposited the securities with the Knickerbocker Trust Company, the objection was made that there was no case for an accounting and that the complaint was not one to disaffirm or to set aside such transactions. The court, however, decided to receive plaintiff's proofs without a strict adherence to her pleading, and also took evidence of the household outlays, as well as those incurred in the building operations, and sat for such hearings on twenty-four days.

He sustained the Bayonne purchase and the July sixth contract. The decree provided for an accounting for the moneys expended by the defendant. Special findings were also made as to the plaintiff's proportion of certain household outlays.

*John Thomas Smith* [*Frank A. Gaynor* with him on the brief], for the appellant.

*Adam K. Stricker* [*Abraham Benedict* with him on the brief], for the respondent.

PUTNAM, J.:

Had an action been seasonably brought to disaffirm the entire Bayonne transaction, plaintiff might have contended that as she had just emerged from her minority, and was still under the influence of defendant as her stepfather and

Second Department, December, 1918.    [Vol. 185.

testamentary guardian, a transaction of this kind should be set aside as manifestly unfit for a young woman just come of age. (*Gale* v. *Wells*, 12 Barb. 84.)

Although the property was of great value with prospective increase, an outlay of $400,000 in a manufacturing plant is not to be recommended to one of her inexperience. But that is not the plaintiff's position. She invokes the court for an accounting, after repeated ratification, indeed a series of acts of control and of ownership. This purchase was soon followed by an action for broker's commission, which was tried in 1912, in which plaintiff and defendant were witnesses. Defendant then testified in the hearing of the plaintiff: " It is her investment pure and simple." Plaintiff testified that she was not present when the purchase contract was made, but said: " I knew about it."

In her cross-examination in the trial at the Special Term she also admitted that when this property was purchased she knew that a sawmill was to be erected there. When that sawmill was first started, plaintiff was present with friends, and received their congratulations. While acts of an inexperienced girl may be of less effect, we have later the plaintiff as a married woman, and her husband the active manager and vice-president of the operating company running this plant.

After the outbreak of the war, while defendant was absent in Europe, Mr. Shiverick's letter reveals him in active management. Though present on the trial, he was not put on the stand.

After the Bayonne fire and on April 28, 1915, Mr. Shiverick came over to the Bayonne plant with Mr. Gaynor, plaintiff's attorney of record. The superintendent asked him for a pass. He answered that he did not need one in order to look over his wife's property. In Mr. Gaynor's presence, Mr. Shiverick said that he could write his own pass and further told the superintendent, " I own the ground that you stand on." When the superintendent still declined, Mr. Gaynor interposed and reminded his client that the superintendent was rightly carrying out his orders.

Mr. Gaynor, however, did not retract or qualify his client's assertion of right and title.

On April 2, 1915, the date of the summons and of the plaintiff's verification of her complaint, we have very definite assertions of plaintiff's legal claim in the avails of this insurance, not from Mr. Shiverick, but from Mr. Gaynor, in his capacity of the plaintiff's attorney. Such is his explicit notice to the insurance adjusters. In his letter to the New York Board of Underwriters he formally notified them " not to conclude the adjustment, nor make any payment of the loss without her consent, given by her individually or through me as her attorney. In other words, no one save Mrs. Shiverick or myself, has any authority to act in the matter for her, and if any authority ever existed, it is hereby revoked."

A month later, on May tenth, a question arose about the keys of the Bayonne property, which were sent to the plaintiff. The next day plaintiff put her watchman in charge. Afterwards, on the twelfth, Mr. Gaynor sought to qualify this as " without prejudice," to which defendant's attorney did not accede.

There was a further participation still more significant. While this action was pending, Mr. Gaynor, as attorney, appeared before the Bayonne tax board and applied for a reduction of its assessed valuation.

Such acts by the attorney in the cause sufficiently evince knowledge, approval and ratification. They are a sequel to plaintiff's personal attitude of steadfast approval of the enterprise. Formal intervention in the insurance proceeds — taking over the keys of the property — and finally appearing as owner's representative before the tax board — all constituted a ratification, complete and now irrevocable. Where large financial transactions go on for several years, the effects of a rescission lead to increased losses with every day's delay. One of adult age, having such right, cannot put off action so as to speculate upon the outcome. To undo her acts, and those based on her acquiescence, a prompt election is indispensable. Otherwise a rescission might work a greater wrong than could flow from the contract thus rescinded. In *Strong* v. *Strong* (102 N. Y. 69, 73) RUGER, Ch. J., said: " It is a settled rule, however, that the right to rescind a contract for fraud must be exercised immediately upon its discovery, and that any delay in doing so, or the continued employment, use and occupation of the property received under the contract, will be deemed an

election to affirm it." (See, also, *Calhoun* v. *Millard,* 121 N. Y. 69, 77; *Brazee* v. *Schofield,* 124 U. S. 495; *Anderson* v. *Fry,* 123 App. Div. 46, 60; affd., 194 N. Y. 515; Pom. Eq. Juris. [3d ed.] § 917.)

The repeated applications during the trial to look at defendant's private check book and his private accounts were properly denied. (*Clarkson* v. *De Peyster,* Hopk. Ch. 424.)

Here is a preliminary agreement, drawn somewhat informally, looking to a future leasing, the covenants and conditions whereof are mentioned in very general terms. Furthermore, we have reached the view that the agreement of which this was a part, though not fraudulent, was part of a method of investment from which plaintiff might have been relieved by a decree setting same aside, had she promptly sought to rescind. While, therefore, we must deny affirmative relief by rescission, we are still empowered to limit the scope of this preliminary agreement to meet a situation since developed. The instrument did not provide for rebuilding, after destruction of the first factory buildings. The plaintiff having herself paid the insurance premium, is entitled to the insurance proceeds collected. (*Harvey* v. *Cherry,* 76 N. Y. 436.) She may further elect to regard the destruction of essential portions of an integral plant as a frustration of the entire object of the proposed adventure. Hence this interlocutory judgment should clearly recognize her right now to withdraw from any reinvestment. If so advised, she should have the right to terminate the investment by a sale or other disposition free and clear of all rights of the defendant. Therefore, paragraph IV of the interlocutory judgment should be modified in two respects: *First,* to declare affirmatively plaintiff's right to elect to dispose of the property, independently of the defendant, upon giving him sixty days' notice of such election. *Second,* the present decretal provision in paragraph VI for rebuilding the burned structures and equipment within six months, in which event the defendant is to have a lease of the plant, should further provide that such lease, besides the six months' cancellation clause, is to include a provision that defendant as lessee is to pay rent from a specific date, also that every three years the lessee, or any sublessee from him, shall make good any depreciation of the plant and structure,

at his own cost — which covenant as a rectification of the agreement would be according to defendant's intended purpose, as he testified on the trial.

I advise that with such modification the interlocutory judgment appealed from be affirmed, but without costs.

JENKS, P. J., THOMAS and KELLY, JJ., concurred; MILLS, J., read for reversal and a new trial.

MILLS, J. (dissenting):

The original investment by defendant of plaintiff's money, made shortly after she became of age and without her having the benefit of independent counsel, was of such an extraordinary nature as to be improvident, and I quite agree with the opinion of Mr. Justice PUTNAM that the plaintiff could seasonably have disaffirmed the transaction. I do not, however, agree with that opinion in the view that she should be held to have lost that right by her subsequent acts of acceptance and control performed before the employment of her attorney. Those acts were performed under the guidance and suggestion of the defendant. Afterwards it was only prudent and proper that she should through her attorney hold on to what stood in her name, as she was clearly entitled to an equitable lien thereon for any balance which might be found due to her from the defendant upon an accounting. For instance, it would have been most unwise for her, pending the accounting, to have surrendered to the defendant the proceeds of the insurance. Defendant's dealing with the plaintiff's fortune, in imperilling it in so hazardous a venture, was, in my judgment at least, most reprehensible, and she ought not to be held estopped from questioning that dealing except upon clear proof of ratification. As I look at it, she was in his hands and subject to his influence while she performed the acts by which the learned trial court has found ratification established. Therefore, I vote for reversal and a new trial.

Interlocutory judgment modified in accordance with opinion and as so modified affirmed, without costs. Order, with appropriate findings in accordance with opinion, to be settled on five days' notice.